UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DANIEL REED CHRISTENSEN, | CIV. 10-4128-KES |
| Plaintiff, | |
| vs. | |
| ROSIE QUINN;<br>SECOND CHANCE RESCUE<br>CENTER;<br>JAMES ADAMSON, individually and in<br>his official capacity as a Turner County<br>Commissioner;<br>LUVERNE LANGEROCK, individually<br>and in his official capacity as a Turner<br>County Commissioner;<br>JOHN OVERBY, individually and in his<br>official capacity as a Turner County<br>Commissioner;<br>STEVE SCHMEICHEL, individually and<br>in his official capacity as a Turner County<br>Commissioner;<br>LYLE VAN HOVE, individually and in<br>his official capacity as a Turner County<br>Commissioner;<br>TIFFANI LANDEEN-HOEKE,<br>individually and in her official capacity as<br>Turner County State's Attorney;<br>BYRON NOGELMEIER, individually<br>and in his official capacity as Turner<br>County Sheriff;<br>JAY OSTREM, individually and in his<br>official capacity as a Turner County<br>Deputy;<br>JIM SEVERSON, individually and in his | MEMORANDUM OPINION AND<br>ORDER ON MOTIONS FOR<br>SUMMARY JUDGMENT |

official capacity as a Special Agent for the
Division of Criminal Investigation;
LARA CUNNINGHAM, individually
and in her official capacity as a Revenue
Agent for the South Dakota Department
of Revenue and Regulations;
THE HUMANE SOCIETY OF THE
UNITED STATES a/k/a HSUS;
WAYNE PACELLE;
SCOTTLUND HAISLEY;
DR. ADAM BAUKNECHT;
EMERGENCY ANIMAL RESCUE
SANCTUARY a/k/a EARS;
DR. DAWN DALE; and
TURNER COUNTY, SOUTH
DAKOTA;

                    Defendants.

Pending are motions for summary judgment by all defendants. Plaintiff, Daniel Reed Christensen, opposes each motion, and separately moves for summary judgment against defendants Humane Society of the United States, Wayne Pacelle, Scottlund Haisley, Dr. Dawn Dale, Dr. Adam Bauknecht, United Animal Nations, Tiffani Landeen-Hoeke, Rosie Quinn, Second Chance Rescue Center, Jim Severson, Lara Cunningham, and Jay Ostrem.

## BACKGROUND

Viewing the facts in the light most favorable to the nonmoving party and noting all disputes of material facts, the facts are as follows:

Christensen lives on a farm in Turner County, South Dakota. Some time before 2009, Christensen began breeding and selling dogs, both on his property and that of his son David and daughter-in-law Kelly.

Quinn is the founder of Second Chance Rescue Center (SCRC), a nonprofit corporation whose mission is to prevent cruelty to animals. During 2009, Quinn was also the executive director of SCRC. SCRC had a contract with Turner County to provide animal control services for Turner County. Adamson, Langerock, Overby, Schmeichel, and Van Hove were, at all relevant times, the county commissioners for Turner County. Landeen-Hoeke was the Turner County state's attorney. Ostrem was a Turner County deputy sheriff. Nogelmeier was the Turner County Sheriff. Severson was an agent with the South Dakota Department of Criminal Investigation. Cunningham was a revenue agent with the South Dakota Department of Revenue.

HSUS is a national animal protection organization. Pacelle is the CEO of HSUS. In 2009, Haisley was the director of emergency services for HSUS. UAN[1] is a private, nonprofit entity that organizes volunteers to provide temporary care for displaced animals. HSUS and UAN regularly coordinated on joint operations. Dr. Bauknecht is a veterinarian licensed in Wisconsin who worked for an animal shelter in Wisconsin and previously volunteered with UAN.  Dr. Dale is a Sioux Falls

---

[1] UAN is identified in the caption and the amended complaint (Docket 133) as Emergency Animal Rescue Sanctuary, or EARS. EARS, which actually stood for Emergency Animal Rescue Service, is not an entity but was a program administered by UAN. *See* Docket 338 at 2 n.1.

veterinarian who works for Dale Animal Hospital. Dr. Dale also served as a member of the board of directors for SCRC.

In early 2009, Quinn received a report that Christensen was selling dogs over the internet without a sales tax license. Quinn reported this information to Landeen-Hoeke, who in turn passed the information on to Cunningham. Cunningham determined that Christensen did not have a state sales tax license and prepared a written notice informing Christensen that he was operating as a retailer without a license and had three days to obtain a license, commonly known as a three-day notice to quit. At Landeen-Hoeke's request, Cunningham also prepared an affidavit so Landeen-Hoeke could charge Christensen with the misdemeanor offense of operating a business without a sales tax license.

Cunningham requested the assistance of Turner County law enforcement to act as an escort when she served the three-day notice. Severson, who was in the area working on a murder investigation, volunteered to accompany Cunningham. Ostrem and Deputy Sheriff Jared Overweg, who is not named as a defendant here, were responsible for serving an arrest warrant on Christensen for the misdemeanor charge. One of the law enforcement officials requested the presence of animal control at Christensen's residence, although there is a factual dispute regarding which party requested animal control's assistance.

4

On April 9, 2009, Cunningham drove to Christensen's property to serve the three-day notice. She was accompanied by Severson, Ostrem, Overweg, Quinn, and Dana Wigg, an animal control officer who is not a defendant in this matter. When the party arrived at Christensen's property, a garage door was open and vehicles were present. When Christensen did not answer his door, Cunningham began to walk around the other buildings on the property to see if she could locate Christensen. During this time, Cunningham was accompanied by at least some of the other law enforcement officials, but it is unclear how closely the group stayed together.

When Christensen could not be located at his property, Cunningham and Severson decided to travel to David and Kelly Christensen's property to see if Christensen could be found there. The rest of the party left Christensen's property. After it became clear that no one was present at David and Kelly's property, Cunningham and Severson returned to Christensen's property and waited on the side of the road across from Christensen's driveway for Christensen to return.

When Christensen returned, Severson notified Ostrem. At that time, Cunningham served the three-day notice on Christensen. Christensen gave Cunningham permission to enter his house for the purpose of examining his business records. Cunningham and Severson then left Christensen's property to copy the records he provided. Ostrem arrested Christensen pursuant to the misdemeanor warrant and took Christensen in for booking. Christensen was released shortly

thereafter. Subsequently, Christensen pleaded guilty to operating a business without a sales tax license, and he obtained a license within the three-day period.

In August 2009, Quinn received at least one complaint about a sick Weimaraner puppy that had been sold by Christensen. Based on that report, Quinn obtained a search warrant for David and Kelly Christensen's property, where she believed the Weimaraners were located. She executed that warrant on August 27, 2009, accompanied by Wigg and Ostrem. No Weimaraners were located on David and Kelly's property, and Ostrem noted that the health of the dogs present appeared adequate, although the living conditions observed were substandard. Quinn and Wigg also went to Christensen's property on August 27, 2009, although the record is in dispute as to how long they were on Christensen's property or what they did while they were there.

Based on the conditions observed at Christensen's property on April 9 and at both properties on August 27, Quinn decided to apply for search and seizure warrants for both properties. Quinn sent the draft affidavits in support of the warrant applications to Landeen-Hoeke for review. Landeen-Hoeke instructed Quinn to omit information from the warrant applications that had been obtained on April 9. The warrant applications also did not contain information that had been observed on August 27 at David and Kelly's property and at Dan Christensen's property.

6

On the morning of September 2, 2009, Quinn, Wigg, and Landeen-Hoeke appeared before State Circuit Court Judge Tim Bjorkman. Judge Bjorkman granted the search and seizure warrant for David and Kelly's property, but denied the application for Christensen's property. Judge Bjorkman allowed Quinn to testify, but again denied the warrant application. Landeen-Hoeke asked Judge Bjorkman if he would consider additional evidence observed by Quinn when she walked around Christensen's property. After Judge Bjorkman said he would consider that evidence, Landeen-Hoeke and Quinn stepped out of the courtroom briefly. When they returned, Quinn testified about her observations from April 9. After hearing the additional information, Judge Bjorkman issued the search and seizure warrant for Christensen's property.

In the days leading up to September 2, 2009, Quinn reached out to HSUS for assistance in removing what she anticipated to be a large number of dogs from both properties. HSUS arranged for a team, led by Haisley, to assist Turner County law enforcement with the search and seizure warrants. UAN, which frequently partnered with HSUS on such operations, arranged to have some volunteers present to care for the dogs once they were removed. Temporary housing for the dogs was set up at the Turner County Fairgrounds.

After Judge Bjorkman issued the two search and seizure warrants, Quinn, Ostrem, and the HSUS team proceeded to David and Kelly's property. Once all the

7

dogs were removed from that property, the team moved to Christensen's property. In all, 173 dogs[2] were seized from both properties and transported to the Turner County Fairgrounds, where volunteers examined each animal. HSUS filmed its activities at the properties and the fairgrounds.

Subsequently, a grand jury indicted Christensen on 173 counts of inhumane treatment of an animal. While the criminal charges were pending, some of the dogs seized from Christensen died, while others were adopted or placed in foster care. After a suppression hearing, State Court Magistrate Judge Tami Bern ruled that Quinn misled Judge Bjorkman when requesting the September 2 warrants and ordered the evidence from the warrants suppressed. Subsequently, the criminal charges against Christensen were dismissed on July 2, 2010. Docket 73-5.

After the criminal charges against him were dismissed, Christensen[3] filed this suit, alleging a conspiracy to commit various constitutional violations and other state-law causes of action. According to Christensen, the defendants conspired to (1) illegally search his property on April 9, 2009; (2) illegally seize his property and deprive him of his due process rights on September 2, 2009; (3) commit the torts of

---

[2] Records show 173 dogs were initially seized but one was euthanized by court order, so only 172 were kept at the Turner County Fairgrounds following the seizure. *See* Docket 369-37 at 5.

[3] Initially, David and Kelly Christensen were named as plaintiffs. *See* Docket 133. The parties stipulated to the dismissal, with prejudice, of David and Kelly's claims, which the court dismissed on December 17, 2012. Docket 193.

malicious prosecution and intentional infliction of emotional distress; (4) violate the South Dakota Animal Enterprise Protection Act; and (5) engage in conduct amounting to criminal trespass and intentional damage to private property. *See* Docket 133 (amended complaint). All defendants have moved for summary judgment, and Christensen has also moved for summary judgment against some, but not all, defendants.[4]

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*,

---

[4] Also pending are: Christensen's motion to strike filings by Landeen-Hoeke (Docket 417); UAN's motion to strike Christensen's surreply (Docket 420), which is joined by Drs. Bauknecht and Dale and by Landeen-Hoeke; and a reply to an objection which contains a motion to strike filed by Christensen (Docket 583). The filings in question do not prejudice any party, nor do they add unique or novel arguments to the extensive record already before the court. Consequently, the motions to strike are denied.

415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a factual dispute that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## DISCUSSION

## I.   FEDERAL CLAIMS

### A.   Official Capacity Claims

#### 1.   Cunningham and Severson

The Eleventh Amendment generally bars suits for damages against a state or state officials in their official capacities unless the state waives its sovereign immunity. *See, e.g., Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). To support his official capacity claims against Severson, Christensen asserts that the state could be liable for failure to train Severson, or for deliberate indifference to Severson's allegedly poor job performance indicated by inmate suits and past credibility questions, Severson's aggressiveness, and the fact that Severson took time off from a murder investigation to assist with the service of a three-day notice. Docket 367 at 53-57. Christensen

contends that those facts create "a jury question as to whether Severson qualifies for 11th Amendment protection." Docket 367 at 57.

Immunity from suit is a question of law for the court, not a question of fact for a jury to decide. *See, e.g., Lopez v. Mendez*, 432 F.3d 829, 835 (8th Cir. 2005) (discussing sovereign immunity); *Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528, 556 (8th Cir. 2004) ("Whether a state has waived its sovereign immunity is a question of law which we review de novo."). Christensen fails to address how South Dakota waived its immunity under the Eleventh Amendment. The cases cited by Christensen deal with liability for supervisors or for local governments, not state governments.[5] Because there is no evidence that South Dakota has consented to suit, Severson is entitled to summary judgment on Christensen's official capacity claims.

Furthermore, neither a state nor its officials acting in their official capacities are "persons" who may be sued for money damages under § 1983. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002); *Will*, 491 U.S. at 71; *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008). The only relief requested by Christensen is money damages. Docket 133 at 29-30. Accordingly, Christensen's official capacity

---

[5] In his brief opposing summary judgment for various Turner County defendants, Christensen recognizes the difference between state and county governments. *See* Docket 443 at 27 (citing *Miener v. State of Missouri*, 673 F.2d 969, 980 (8th Cir. 1982) ("Controlling case law holds that a county, as well as the school board of such a political subdivision, does not occupy the same position as a state for eleventh amendment purposes.")).

claims against Severson for money damages also fail because Severson, in his official capacity, is not a proper party under § 1983.

The amended complaint asserts claims against Cunningham in both her individual and official capacities. Christensen concedes, however, that there is no evidence to support a claim against Cunningham in her official capacity.[6] Docket 367 at 54. Thus, Cunningham is entitled to summary judgment with regard to the claims alleged against her in her official capacity.

### 2.   Adamson, Langerock, Overby, Schmeichel, Van Hove, Landeen-Hoeke, Nogelmeier, Ostrem, and Turner County

Christensen alleges that Turner County, the Turner County Sheriff, a deputy sheriff, the Turner County state's attorney,[7] and the Turner County Commissioners[8] also participated in the conspiracy to deprive him of his Fourth Amendment rights. To subject the county defendants to liability in their official capacities,[9] Christensen

---

[6] It is unclear if Christensen intended this concession to apply generally to all his official capacity claims against Cunningham, or just his official capacity claim against Cunningham in Count I. Even if Christensen intended to limit the concession to Count I, he failed to oppose Cunningham's argument that she is entitled to Eleventh Amendment immunity on the claims against her for money damages in her official capacity or that she is not a "person" amenable to suit under § 1983. Failure to oppose a basis for summary judgment constitutes a waiver of that argument. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Tr.*, 558 F.3d 731, 735 (8th Cir. 2009).

[7] Landeen-Hoeke is named in her individual and official capacities in Count I only.

[8] Christensen does not name Overby as a defendant in Count II.

[9] In their initial brief supporting their motion for summary judgment, the

12

must show that the constitutional violations alleged stemmed from an

unconstitutional policy or custom. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Because

the real party in interest in an official-capacity suit is the governmental entity and not

the named official, 'the entity's 'policy or custom' must have played a part in the

violation of federal law.' " (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))).

"Assuming the existence of an unconstitutional [government] custom, a § 1983

---

county commissioners, Nogelmeier, Ostrem, and Turner County assert Eleventh
Amendment immunity and claim that Christensen cannot show an unconstitutional
policy or custom. In their reply brief, however, the county commissioners,
Nogelmeier, Ostrem, and Turner County appear to properly concede that the
Eleventh Amendment does not bar suits against county officials, and they rely on the
defense of a lack of an unconstitutional policy or custom. *See* Docket 533 at 2 ("At
page 28 of his Brief, Plaintiff correctly states the general law regarding defendants
such as the individual Turner County Defendants, with regard to official capacity
claims . . . .").

　　Landeen-Hoeke also asserts Eleventh Amendment immunity. *See* Docket 414
at 17-18. Unlike the other defendants, Landeen-Hoeke does not concede this issue,
and cites to decisions extending Eleventh Amendment immunity to county
prosecutors. *See* Docket 531 at 15 (citing *Hayden v. Nevada Cnty., Ark.*, 2009 WL
596534, at *5 (W.D. Ark. March 6, 2009); *St. John v. Fritch*, 2012 WL 3028032, at *7
(S.D. Ind. July 24, 2012)). *St. John* discussed an Indiana statute on point; the fact that
the attorney in question would be defended by the Attorney General of Indiana; and
the fact that a judgment would be paid by the state of Indiana. *St. John*, 2012 WL
3028032, at *7. Landeen-Hoeke cites no authority that the state of South Dakota,
rather than Turner County, would pay for a judgment against her in her official
capacity. *See Miener*, 673 F.2d at 980 (examining which governmental entity would pay
for a judgment in determining the availability of Eleventh Amendment immunity).
Here, Landeen-Hoeke was not defended by the Attorney General's office and the
salary of the state's attorney is set and paid by the county commissioners pursuant to
SDCL 7-7-12. Therefore, the court will evaluate Christensen's official capacity claims
against Landeen-Hoeke using the standard applicable to Turner County. Under these
facts, the use of state or county immunity standards does not change the outcome.

claimant cannot recover unless the claimant also proves that the custom caused the resulting injury." *Ricketts v. City of Columbia, Mo.*, 36 F.3d 775, 779 (8th Cir. 1994). " '[I]t is when execution of a government's policy or custom . . . *inflicts* the injury that the government as an entity is responsible under § 1983.' " *Id.* (alterations and emphasis retained) (quoting *Monell v. New York City Dep't of Social Serv.*, 426 U.S. 658, 694 (1977)).

Christensen points to the following policies or customs of Turner County: the contract with SCRC giving Quinn the powers of a peace officer based on a repealed statute; Nogelmeier's policy of turning all animal control cases over to Quinn; and the policy or custom of giving Landeen-Hoeke too much power and the failure to remove her from office. *See* Docket 443 at 28 (contract with SCRC); *id.* at 29 (Nogelmeier's practice of allowing Quinn to handle the case); *id.* at 30-31 (Landeen-Hoeke's employment).

First, Christensen has failed to show that the allegedly unconstitutional policies are actually unconstitutional. The fact that the legislature repealed the statute upon which the contract between Turner County and SCRC was based calls into question the validity of the arrangement between the county and SCRC, but it does not implicate the federal constitutionality of the arrangement. Second, Christensen provides no support for the proposition that Nogelmeier's policy of allowing a private party with a government contract to investigate animal cruelty or neglect cases is

14

unconstitutional. *See, e.g., Filarsky v. Delia*, 132 S. Ct. 1657, 1665-66 (2012) ("Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals."). Third, even if Landeen-Hoeke is the inept official Christensen alleges, it would not be unconstitutional for Turner County to employ her.[10]

Furthermore, Christensen fails to show any of the alleged policies to be the cause of a violation of his Fourth Amendment rights. Even if the facts relating to the alleged conspiracy are true, the source of Christensen's harm is not any of the policies that he claims are unconstitutional, but rather the source of his harm is the conduct of the individuals. Additionally, Christensen fails to identify evidence of similar prior behavior amounting to a custom by any of these officials. Because Christensen cannot show that the policies he alleges as the bases for the county defendants' liability are unconstitutional or that the policies themselves inflicted the injury he claims to have suffered, the county defendants are entitled to summary judgment on the official capacity claims brought against them.

---

[10] It is unclear what steps Christensen thinks Turner County should have taken to remove Landeen-Hoeke—a duly elected public official—from office. Christensen relies on the proposition that the county failed to consult the attorney general to determine if Landeen-Hoeke could be removed from office and this failure constitutes the requisite unlawful policy or custom. *See* Docket 443 at 30 n.67. But Christensen alleges no further basis to establish the unconstitutionality of allowing Landeen-Hoeke to continue to act as the state's attorney.

### B.    Individual Capacity Claims

Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983. In this case, Christensen alleges that the defendants conspired to deprive him of his constitutional rights. "To prove a § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). A plaintiff "is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.*

A conspiracy may be, and often is, shown by circumstantial evidence. *See Small v. McCrystal*, 708 F.3d 997, 1010 (8th Cir. 2013). " 'The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims.' " *Id.* (quoting *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008)). Nonetheless, " '[a] party may not cry 'conspiracy' and throw himself on the jury's mercy . . . . There must be a genuine issue about a material fact[.]' " *Mershon v. Beasley*,

994 F.2d 449, 452 (8th Cir. 1993) (quoting *Gramenos v. Jewel Companies*, 797 F.2d 432,

436 (7th Cir. 1986)). "To advance past the summary judgment stage, [a plaintiff] must

'allege with particularity and specifically demonstrate material facts that the defendants

reached an agreement.' " *Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 582 (8th Cir.

2006) (quoting *Marti v. City of Maplewood, Mo.*, 57 F.3d 680, 685 (8th Cir. 1995)).

### 1.    Count II

Count II alleges a violation of Christensen's Fourth Amendment rights.

According to Christensen, defendants Severson, Nogelmeier, Ostrem, Cunningham,

Adamson, Langerock, Schmeichel, Van Hove, Quinn, SCRC, and Turner County

conspired to deprive Christensen of his Fourth Amendment rights when they served

the three-day notice and arrest warrant on Christensen on April 9, 2009.[11]

---

[11] Christensen does not allege in his amended complaint that Landeen-Hoeke is liable under Count II for the events of April 9, 2009. *See* Docket 133 at 23 (listing defendants). Christensen contends that he mistakenly left Landeen-Hoeke off the list of defendants in Count II, and that because she had notice of the claims against her, he should be allowed to include Landeen-Hoeke in Count II. *See* Docket 484 at 54-55. Christensen never moved to amend the complaint, and the deadline to amend has passed. Christensen makes no effort to show good cause for the omission of Landeen-Hoeke from Count II, nor does he attempt to correct the omission except to assert that everyone knew Landeen-Hoeke should have been included. In this case, Landeen-Hoeke relied on the omission in Count II in moving for summary judgment, *see* Docket 414 at 23, Docket 531 at 5-6, and would be prejudiced by allowing Christensen to simply incorporate Landeen-Hoeke by reference in a response brief.

Landeen-Hoeke's actions are nonetheless relevant because they may show that one or more of the defendants named in Count II conspired with Landeen-Hoeke, or that Landeen-Hoeke joined the conspiracy alleged in Count I. But because Christensen did not include Landeen-Hoeke as a defendant in Count II, she cannot be

### a.      Fourth Amendment Protection

Before addressing whether any defendant is entitled to qualified immunity on Count II, the court will examine whether Christensen can show a Fourth Amendment violation on April 9, 2009. *See Askew*, 191 F.3d at 957 (requiring a plaintiff to show a deprivation of a constitutional right or privilege).

### i.      Christensen's House

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). A Fourth Amendment violation occurs when an officer commits an unlicensed physical intrusion into a protected area or violates a person's reasonable expectation of privacy. *See id.* at 1417 ("The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." (italics in original) (quoting *United States v. Jones*, 132 S. Ct. 945, 951-52 (2012)).

---

liable on Count II. *See Jackson v. Mo. Bd. of Probation and Parole*, 306 F. App'x 333, 333-34 (8th Cir. 2009) (holding that even a pro se defendant was required to name the proper parties).

Christensen identifies evidence that at least some of the officers came up to his house before walking around his property. *See* Docket 369-3 at 3 (stating that Cunningham knocked on the door to Christensen's house on April 9, 2009). But approaching a house and knocking on a door does not violate the Fourth Amendment. *See Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) ("Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)); *Nikolas v. City of Omaha*, 605 F.3d 539, 545-46 (8th Cir. 2010) ("It is clear that, without a warrant, Benson could enter the property through its open gate and proceed up the driveway to the front door of the main residence . . . . Likewise, viewing the exterior of the garage while proceeding up the driveway required no warrant."). Furthermore, Christensen does not identify any evidence that any official intruded on his home itself beyond approaching the door and knocking. *See* Docket 369-12 at 7-8 (testifying that when Christensen did not answer his door, the group looked around the outbuildings for Christensen but never went behind his house). Christensen also does not contend that Cunningham's presence in his house or inspection of his business records, both of which took place after Christensen was home and with his consent, violated the Fourth Amendment. *See* Docket 369-3 at 6-7 (stating that Christensen consented to law enforcement entering his house and inspecting his business records). Because no Fourth Amendment violation took place

at Christensen's home itself, the court must determine whether the other buildings on Christensen's property enjoy Fourth Amendment protection.

## ii.    Curtilage

The Fourth Amendment protects a person's home and the area immediately around it to which "the intimate activity associated with the sanctity of a man's home and privacies of life" extend. *Oliver v. United States*, 466 U.S. 170, 180 (1984). This protection, however, "does not extend past the curtilage. Officers are permitted to enter a resident's property to observe buildings located outside the home's curtilage." *United States v. Gerard*, 362 F.3d 484, 487 (8th Cir. 2004). Property outside the curtilage does not enjoy Fourth Amendment protection, and society does not recognize a reasonable privacy interest in open fields. *Oliver*, 466 U.S. at 179-80. Accordingly, to demonstrate a violation of his Fourth Amendment rights, Christensen must show that the areas entered by the government agents on April 9, 2009, were part of the curtilage of his home.

It is unclear whether a curtilage determination is a factual or legal question. Following the Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690 (1996), several circuits have treated curtilage determinations as legal conclusions and have applied de novo review. *See, e.g., United States v. Cousins*, 455 F.3d 1116, 1121 (10th Cir. 2006) (collecting cases). Although the Eighth Circuit has applied clear error review to curtilage determinations at least twice post-*Ornelas*, it has recognized a potential

20

conflict between clear error review and *Ornelas*. *See United States v. Bausby*, 720 F.3d 652, 655-56 (8th Cir. 2013); *United States v. Wells*, 648 F.3d 671, 675-76 (8th Cir. 2011) ("[W]ere we the first panel of our court to review a district court's curtilage determination post-*Ornelas*, we might well hold that *de novo* review applies to such determinations. But we are not the first. . . . Having acknowledged the conflict in our holdings, it is not within our power to resolve it. Nor would resolution of that conflict affect the result in this case."). Similarly, the outcome in this case does not depend on whether a curtilage determination is a question of law or fact. There are no genuine factual disputes that might impact whether the buildings in question are part of the curtilage of Christensen's home.

To decide whether outbuildings are part of the curtilage, a court should consider "the proximity of the buildings to the farmhouse, whether the farmhouse and [buildings] are within the same enclosure, the nature and uses of the [buildings] and the steps [Christensen] took to protect the [buildings] from being seen by others." *Gerard*, 362 F.3d at 487 (citing *United States v. Dunn*, 480 U.S. 294, 300 (1987)). "[T]hese factors are not applied mechanically or in isolation . . . ." *Id.* at 488.

The buildings surrounding Christensen's home are various distances from Christensen's house itself. *See* Docket 174-9 at 9 (listing distances). The measured distances range from 18.5 feet to 284 feet. *Id.* But distance alone is not determinative. *Gerard*, 362 F.3d at 487 ("The distance alone, however, is not determinative that [a

building] should be treated as an adjunct of the house."). Similarly, some of the buildings are located on the same side of the driveway as the house but outside of what appears to be a small yard, while others sit across the driveway from the house. *See* Docket 337 at 21. Significantly, Christensen emphasizes that the buildings were separated from the house by chain-link fences. *See* Docket 367 at 37-40 (arguing that the outbuildings were enclosed to prevent intrusion); Docket 369-17 (showing two barns separately enclosed by chain-link fences).

Pictures of the outbuildings demonstrate that the buildings on Christensen's property[12] (1) were separated from the home by chain-link fences and kennels that contained dogs, debris, and water dishes containing discolored and dirty water; (2) were surrounded by overgrown vegetation and in some instances large amounts of dog feces; and (3) were boarded up where windows had once been but contained holes through which dogs could pass from the interior of the building to the kennels. *See* Docket 351-4 (showing the kennels and overgrown vegetation outside one of Christensen's buildings); Docket 419-1 at 1-4 (showing buildings surrounded by chain-link kennels, overgrown vegetation, and dog feces, and showing covered windows and holes in the sides of buildings); Docket 419-3 at 6 (showing a large amount of feces and mud surrounding a building); Docket 430-1 (showing a dog

---

[12] In some instances, it is difficult to tell whether a given photo depicts Dan Christensen's property or the property of David and Kelly Christensen. Nonetheless, all photos provided depict buildings in similar conditions to those described here.

skeleton outside one of the buildings). Additionally, Christensen designates as evidence videos shot by HSUS personnel that further illustrate the state of the outbuildings on Christensen's property. *See* Docket 361-28, scene 10 (depicting conditions); scene 11 (same); scene 13 (same); scene 16 (same); *see also United States v. Mooring*, 137 F.3d 595, 597 (8th Cir. 1998) ("After seeing a video tape of the barn's interior, the district court noted 'that a picture is worth a thousand words,' and the video confirmed the barn was not associated with the Moorings' domestic life."). In fact, Christensen himself argues that the condition and structure of the buildings should have indicated to any reasonable officer that Christensen was not inside, indicating that the use of the buildings was not consistent with human presence. *See* Docket 367 at 7 (discussing finding a dead rat behind one of the "rickety" doors); *id.* at 43 ("Given that Cunningham also claims she couldn't even figure out how [Christensen] could have entered the building and have managed to shut the rickety door behind him so that it stayed shut in the manner in which Cunningham and Severson found it, makes any claim that Severson and Cunningham were legitimately looking into the building in order to locate Christensen preposterous.").

In considering the steps Christensen took to protect the buildings from observation, the buildings are set off from the highway by a row of trees, but they would be visible from the driveway as a visitor approached the house. *See* Docket 337 at 21. "The fact that one's view from the road of the [buildings at issue] is obscured

by the trees does not itself establish that [those buildings] should be included within the farmhouse's Fourth Amendment protection." *Gerard*, 362 F.3d at 488. Although they are surrounded by chain-link fences, such fences do not limit visual observation and offer little protection from inspection. *See United States v. Tolar*, 268 F.3d 530, 532 (7th Cir. 2001) ("[A] chain-link fence does little to assert a privacy interest (as opposed to property interest) in details visible from outside the fence."). In some instances it would have been possible to peer into the interior of the buildings through holes. *See, e.g.*, Docket 419-1 at 1-4 (showing holes).

After weighing the four *Dunn* factors, the court concludes that the outbuildings on Christensen's property were not part of the curtilage of his home.[13] Although some of the buildings were close to the home, some were a great distance. The buildings were separately enclosed by fences, which set them off from the house itself. Overall, the layout of Christensen's property weighs in favor of a finding that the buildings are not part of the curtilage of his house. The buildings were also not protected from

---

[13] Magistrate Judge Bern concluded that the outbuildings were part of the curtilage and that Christensen had a subjective and reasonable expectation of privacy in those buildings. *See* Docket 329-9 at 8-9; Docket 369-10 at 7. Magistrate Judge Bern's findings do not bind this court. Furthermore, Magistrate Judge Bern offered little explanation for her determination that the buildings were part of the curtilage of Christensen's property, stating only that "[t]he buildings and surrounding fenced area where the dogs were housed are curtilage of the Defendant's home in light of the proximity of the area to the home, the fact that the buildings are enclosed and fenced in to house animals and the same are not generally visible to people passing by." Docket 329-9 at 8-9. It seems that her ruling on the curtilage issue was an alternative explanation for her finding that the September 2, 2009, warrants should be suppressed because Christensen had a property interest in the dogs seized.

public view. Although they would not have been easily visible from the road bordering Christensen's property, they would have been visible from the driveway, where any member of the public might stand. The fences would not have obstructed one's view of the buildings, and the interiors would have been visible to anyone who could approach and look through one of the holes.

The most persuasive factor, though, is the nature and use of the buildings. Their appearance makes it clear that the buildings were not associated with domestic activities of an intimate or private nature. They were fenced off, surrounded by overgrown vegetation, dilapidated, unlit, and in several cases were surrounded by large amounts of waste. The state of these buildings is inconsistent with "the intimate activity associated with the sanctity of a man's home and privacies of life . . . ." *See Oliver*, 466 U.S. at 180. Therefore, the outbuildings on Christensen's property are not part of the curtilage of his home and do not share the home's Fourth Amendment protection.

### iii.    Objectively Reasonable Expectation of Privacy

Christensen contends that even if the buildings on his property were not part of the curtilage of his house, they were still protected by the Fourth Amendment because he had a reasonable expectation of privacy. *See* Docket 367 at 37-40. Property, even private property, outside the curtilage is generally considered an "open field," which enjoys no Fourth Amendment protection. *See Oliver*, 466 U.S. at 178-80.

25

"But the open fields doctrine only allows a search of what is in plain view in the open field. It does not justify a warrantless search of a man-made enclosure found in an open field." *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002).

There is a factual dispute about whether Cunningham, Severson, or Quinn opened a door to one of the buildings, stepped inside, and called for Christensen before leaving. In ruling on defendants' motions for summary judgment, the court views the facts in the light most favorable to Christensen and assumes that each of those three individuals entered at least one of the buildings. To demonstrate a Fourth Amendment violation stemming from an entry into the outbuildings themselves, Christensen must establish that he asserted a subjective expectation of privacy in the outbuildings, and that his subjective expectation is objectively reasonable. *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014).

If Christensen had a subjective expectation of privacy in his outbuildings, the court must then decide whether that expectation was objectively reasonable. *Id.* ("The first question is a question of fact, the second is a question of law."). The Supreme Court's decision in *Dunn* and the Eighth Circuit's subsequent decision in *Pennington* make clear that although an officer may stand in an open field and observe activity in an enclosed structure, even from immediately next to the structure, law enforcement usually should obtain a warrant before entering a structure in an open field. *Dunn*, 480 U.S. at 304 (noting that the officers did not enter the barn but instead stood in an

open field and "peered into the barn's open front"); *Pennington*, 287 F.3d at 745 ("The Supreme Court made that clear in *Dunn* when it emphasized that the investigating officers looked through the window of a barn that was outside the curtilage, but did not enter the barn until they obtained a warrant.").

In this case, the barns were enclosed by chain-link fences. The doors to the barns were closed although not locked. Although the siding on the buildings contained a number of holes, the interiors were unlit. As a result, the officials would have had to open the doors and enter the buildings to see whether Christensen was within the interior.

Those facts are significant in determining whether Christensen had an objectively reasonable expectation of privacy in his outbuildings. The fences around the buildings offered some protection against encroachment. The buildings were enclosed and had doors, but the doors were not locked. *See Pennington*, 287 F.3d at 745-46 (relying on the fact that the bunker had no door impeding access to find that there was no objectively reasonable expectation of privacy). Although the buildings had holes in the walls, the interiors were not easily visible through those holes due to the lack of interior lighting. Objects in the interior of the barn were not openly visible to a person standing outside, making it necessary for law enforcement to open the doors to the buildings to see inside. Because inspection of the buildings would have

27

required a physical entry, Christensen had an objectively reasonable expectation of privacy in the contents of the outbuildings of his property.

Because the court has found that Christensen had an objectively reasonable expectation of privacy in the outbuildings, the court will next address the issue of whether Cunningham, Severson, and Quinn—the members of the party who entered the buildings—were licensed to intrude for a legitimate law enforcement purpose, whether there is sufficient evidence of a conspiracy, and whether the officials in question are entitled to qualified immunity.

### b.    Liability

### i.    Cunningham

There is evidence that Cunningham entered at least one of the outbuildings on April 9, 2009. Law enforcement may make limited intrusions into protected areas for legitimate purposes, such as the service of civil process, without violating the Constitution. *See United States v. Gonzalez*, 441 F. App'x 404, 406 (8th Cir. 2011) ("This Circuit has found invasions into an area where a person holds a reasonable expectation of privacy to be lawful so long as the intrusion was justified by 'some legitimate reason for being present unconnected with a search directed against the accused.' " (quoting *United States v. Anderson*, 552 F.2d 1296, 1299-1300 (8th Cir. 1977))); *United States v. Raines*, 243 F.3d 419, 420-21 (8th Cir. 2001) ("We conclude that Davison's limited intrusion was justified because he had the legitimate objectives of locating Toni Will,

who he had reason to believe was located at the residence, and serving her with civil process.").

In *Raines*, the deputy knocked on the front door of Raines's house and no one answered. *Id.* at 420. Because the deputy observed several cars parked in the driveway, he believed people might be enjoying the summer evening in the backyard. As a result, the deputy proceeded through a makeshift wall into the backyard, where he observed marijuana. *Id.* at 420-421. The Eighth Circuit held that the deputy did not violate Raines's Fourth Amendment rights even though he entered the curtilage of Raines's home without a warrant because the deputy was engaged in a good faith attempt to serve civil process. *Id.* at 422.

Christensen does not challenge the holding in *Gonzalez* and *Raines,* which recognizes that that limited intrusions into protected areas for legitimate purposes are permissible.[14] Instead, Christensen appears to contend that Cunningham could not have had a reasonable belief that Christensen was in the areas where she looked.

Christensen does not dispute that when Cunningham arrived on April 9, 2009, Christensen's garage door was open and vehicles were present. As in *Raines,* those

---

[14] The Supreme Court has held that officers can violate the Fourth Amendment by trespassing on private property. A trespass does not occur if an officer enters areas on private property that are traditionally open to members of the public, such as a walkway or front porch. *See Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011))).

facts support a reasonable belief that someone might be home at Christensen's residence but unable to hear knocking on the front door. Christensen argues that the buildings Cunningham, Severson, and Quinn entered were unlit and surrounded by chain-link fences, and that it is unlikely Christensen would have entered a building with a makeshift door and pulled it closed behind him. *See* Docket 367 at 41, 43, 47. The facts that a building had a rickety door or a chain-link fence around it does not prove that Christensen could not have been in that building at the time Cunningham was trying to locate him. Furthermore, the fact that a building's interior was unlit is a fact that would have been unknown to Cunningham until she actually opened the door to the building. This evidence does not tend to show that Cunningham exceeded her license to attempt to locate Christensen on his property.

The evidence cited by Christensen, viewed in the light most favorable to him, is insufficient to create a genuine question of fact as to whether Cunningham was actually engaged in a good faith effort to serve civil process on Christensen. Because the facts of the limited intrusion here are indistinguishable from *Raines*, Cunningham's actions on April 9, 2009, did not violate Christensen's Fourth Amendment rights.

Even if Cunningham did not personally violate Christensen's constitutional rights, she could still be liable if she conspired with another person to do the same. In support of his conspiracy theory, Christensen contends that the short amount of time between Landeen-Hoeke's report to Cunningham and the service of the three-day

30

notice and arrest warrant indicates a conspiracy. Christensen also argues that the size of the party at Christensen's property and the presence of animal control officers, even though there were no loose dogs seen and Quinn and Wigg did not bring any gear along, support the conclusion that the trip to Christensen's property was a cover for an illegal search. Christensen also points out that Cunningham met with Quinn, Severson, and Landeen-Hoeke on the morning of April 9, 2009, at the Turner County courthouse before going to Christensen's property, and that Cunningham therefore had an opportunity to conspire with the other defendants.

"Various people engaged in investigating and reporting suspected criminal activity does not amount to a conspiracy. We look for a genuine factual issue of concerted activity *toward an unlawful objective*." *Myers v. Morris*, 810 F.2d 1437, 1454 (8th Cir. 1987) (emphasis added), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478, 483-84 (1991)); *accord Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 582 (8th Cir. 2006). Cunningham testified, and Christensen does not refute, that one day is a normal time frame for an investigation into a misdemeanor sales tax license issue such as the one performed by Cunningham on April 8, 2009, and that it is ordinary for a revenue agent to prepare an affidavit for a prosecutor. Docket 410-1 at 3-4. These actions by Cunningham do not show that she agreed to participate in unlawful conduct. Similarly, Cunningham's presence at the courthouse on the morning of April 9, 2009, does not show that she joined a conspiracy. Christensen's contention that it would

have been possible for all the defendants, including Cunningham, to plan their conspiracy at that meeting is entirely speculative. *See Crawford v. Van Buren Cnty., Ark.*, No. 4:09CV00932 SWW, 2011 WL 1464513, at *4 (E.D. Ark. April 15, 2011) (finding evidence that defendants were present at a meeting where statements possibly indicating the objective of a conspiracy were made, to be insufficient to support a finding of conspiracy against those defendants) *affirmed by Crawford v. Van Buren Cnty., Ark.*, 678 F.3d 666 (8th Cir. 2012).

Christensen also relies heavily on actions taken by Quinn on April 9, 2009. The number of people, including Quinn, on Christensen's property on April 9, 2009, does not by itself show that Cunningham reached an agreement to deprive anyone of any constitutional rights. Furthermore, Cunningham's presence on Christensen's property at the same time as Quinn is insufficient to prove that Cunningham conspired with Quinn or others. *See Crawford*, 678 F.3d at 671 ("Notably, the defendants' mere presence during the search was not sufficient to prove a conspiracy existed. Therefore, the court properly granted summary judgment because no evidence supported the conspiracy allegations."). There is no evidence that Cunningham reached an agreement with Quinn or others to get Quinn onto Christensen's property so Quinn could unlawfully search Christensen's dog breeding operation. Furthermore, there is no evidence that Cunningham had any knowledge of where Quinn went or what she did after Cunningham left Christensen's property.

Christensen points to other evidence arising after April 9, 2009, that he claims creates a question of fact as to whether Cunningham joined the alleged conspiracy. Christensen contends that because Cunningham did not reveal during her testimony at the suppression hearing that Landeen-Hoeke was the person who started the sales tax license investigation, this indicates that Cunningham was part of the alleged conspiracy. Similarly, Christensen argues that discrepancies in Cunningham's deposition testimony, such as who opened which door to which building and whether Cunningham stepped on a rat, indicate an attempt to cover up the truth, and therefore suggest Cunningham was involved in the alleged conspiracy. Many of these facts are not material, and none of them provides any actual proof, beyond speculation and innuendo, that Cunningham reached an agreement with anyone to deprive Christensen of his constitutional rights.[15]

Christensen does submit an email chain between Cunningham and Landeen-Hoeke from April 21, 2009, in which Cunningham advises Landeen-Hoeke of the status of Christensen's sales tax license and asks whether SCRC executed a search warrant on Christensen's property. *See* Docket 369-35. These emails shows that Cunningham was aware that a search of Christensen's property would require a

---

[15] As an example, Christensen argues that Cunningham knew Severson because Severson and Cunningham's husband worked together, and it is reasonable to infer from that fact that Cunningham willingly assisted Severson in going after Christensen because Severson and Christensen have a history. That is the type of speculation which is insufficient to survive summary judgment.

warrant, but they do not contain any evidence that Cunningham agreed with Landeen-Hoeke, Quinn, or anyone else to deprive Christensen of his rights. Although the evidence is viewed in the light most favorable to Christensen, Christensen is still required to present specific evidence of the alleged agreement or understanding. *See Reasonover*, 447 F.3d at 582.

Cunningham enjoyed a limited license to intrude on Christensen's property to locate Christensen and to serve the three-day notice on him. Christensen has failed to identify sufficient evidence linking Cunningham to the alleged conspiracy. Accordingly, Cunningham is entitled to summary judgment on Count II.

### ii.    Severson

As with Cunningham, there is a factual question as to whether Severson entered any of the outbuildings on April 9, 2009. For the same reasons stated with respect to Cunningham, Severson had a limited license to enter those areas to serve civil process. The court turns next to whether Severson joined the alleged conspiracy.

To show that Severson disliked Christensen and had a motive to conspire with others to violate Christensen's rights, Christensen alleges that he and Severson "go way back." *See* Docket 367 at 34. But Christensen's assertions about Severson's state of mind and motivations are speculative. Additionally, even assuming there was some personal animosity between Severson and Christensen, that fact does not show that Severson joined a conspiracy to violate Christensen's constitutional rights.

34

Christensen emphasizes that Severson is the individual who requested that Quinn accompany the party. *See, e.g.*, Docket 367 at 5-6. Severson admitted that he asked Quinn to accompany the party that day because he was worried about loose dogs and wanted Quinn there to protect the officers in case they were attacked. *See* Docket 292-2 at 7 (Severson stating that he requested the assistance of animal control to protect the party from dogs). This justification for Quinn's presence is inconsistent with Quinn's recollection that she was there to care for the animals after Christensen was arrested.[16] *See* Docket 369-2 at 4 (Quinn stating that she was present on April 9, 2009, to care for the dogs after Christensen was arrested); Docket 369-15 at 12 (Quinn stating that she was unaware that Severson thought she was there to protect the party from loose dogs). Christensen notes, however, that Quinn did not bring along any equipment that would have allowed her to control loose dogs. *See* Docket 369-3 at 9.

Viewed in the light most favorable to Christensen, these facts establish that Severson agreed that Quinn could accompany the party serving the warrant and the three-day notice to Christensen's property on April 9, 2009. But Quinn stated that she did not enter the outbuildings until after Severson and the rest of the party left. Docket 369-15 at 18. Importantly, Christensen provides no evidence that Severson

---

[16] Quinn also testified that she thought Ostrem, not Severson, asked her to accompany the party on April 9, 2009. *See* Docket 369-2 at 3.

knew or had any part in Quinn's activities of entering the outbuildings on April 9, 2009. Nor is there evidence that Severson authorized Quinn to enter the outbuildings.

Christensen makes other allegations, such as Severson took an excessive amount of time away from a homicide investigation to assist with the service of the three-day notice (Docket 367 at 33); that Severson's testimony regarding April 9, 2009, conflicts with the testimony of others present in various ways (Docket 367 at 36); and that Severson could not have felt threatened by the dogs because he did not have his gun drawn when walking around Christensen's property (Docket 367 at 33-34). None of those facts provides the missing piece of Christensen's theory: some type of knowledge on Severson's behalf that Quinn or others intended to violate Christensen's constitutional rights. Without any evidence that Severson knew of the alleged constitutional conspiracy, Severson cannot be liable as a conspirator, even if his acts resulted in furthering the conspiracy.

Severson did not personally violate Christensen's constitutional rights because he was licensed to intrude on Christensen's property. Additionally, Christensen has not identified evidence sufficient to show that Severson knowingly joined the alleged conspiracy. Severson is entitled to summary judgment on Count II.

### iii.    Quinn and SCRC

Quinn is only licensed to intrude on Christensen's property if she is engaged in a good faith effort to assist law enforcement in serving the three-day notice and the

arrest warrant, but not if those justifications were an excuse to perform an unrelated search of Christensen's property. *See Gonzalez*, 441 F. App'x at 406. Quinn's justification for her presence is inconsistent with what others thought she was doing. *See* Docket 369-2 at 4 (Quinn stated that she was present on April 9, 2009, to care for the dogs after Christensen was arrested); Docket 369-15 at 12 (Quinn stated that she was unaware that Severson thought she was there to protect the party from loose dogs). Quinn did not bring along any equipment that would allow her to control loose dogs. *See* Docket 369-3 at 9. And Quinn testified in her deposition that Landeen-Hoeke mentioned that service of the arrest warrant and three-day notice was a good opportunity to check Christensen's property for evidence of allegations of neglect. Docket 484 at 7 n.12. This evidence is sufficient to create a question of fact as to whether Quinn was on Christensen's property to help serve the arrest warrant and three-day notice, or if she was really there to search Christensen's property and did so without a warrant.

Because there is a question as to whether Quinn violated Christensen's Fourth Amendment rights or joined the alleged conspiracy, the court next turns to whether Quinn is entitled to qualified immunity. " '[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Smith v. City of Minneapolis*, 745 F.3d

541, 545 (8th Cir. 2014) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). This protection extends to allegations of conspiracy. *See, e.g., Pendleton v. St. Louis Cnty.*, 178 F.3d 1007, 1010 (8th Cir. 1999) (refusing to review the sufficiency of the evidence linking the defendants to the conspiracy, but reviewing "whether Defendants objectively could have believed that the conduct in which they allegedly engaged did not violate clearly established law").

Resolving a question of qualified immunity " 'involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.' " *Smith*, 2014 WL 2535298, at *2 (quoting *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013)). For a right to be clearly established, there does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al -Kidd*, 131 S. Ct. 2074, 2083 (2011). The court may address either prong first. *Id.* at 2080 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "Qualified immunity is a question of law not a question of fact." *McClendon v. Story Cnty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005).

In this case, Christensen has a clearly established right to be free from unreasonable searches and seizures in the outbuildings on his property. *See Pennington*, 287 F.3d at 745 (recognizing that buildings such as barns enjoy Fourth Amendment protection). The rule prohibiting physical intrusions into buildings such as barns has been established in this circuit since at least 2002 when *Pennington* was decided. A reasonable animal control officer would be aware of that right. For the reasons discussed above, the evidence identified by Christensen supports a violation of that right. Therefore, Quinn is not entitled to summary judgment on Count II.

SCRC argues that it is not liable for Quinn's actions and that Christensen cannot identify an unconstitutional policy or custom sufficient to trigger liability on behalf of SCRC. Docket 474 at 16-17. Christensen responds by contending that "Rosey Quinn is Second Chance." Docket 520 at 38. He then cites instances in which Quinn hired family members and exercised control over the operations of SCRC. *See* Docket 520 at 38-40. Christensen fails to provide any legal authority. *See id.* (containing no supporting authority). The court construes this argument as a claim that Quinn represented the official company policy of SCRC.

SCRC is correct that a corporation cannot be liable "*solely* because it employs a tortfeasor." *Smith v. Insley's Inc.*, 499 F.3d 875, 881 n.4 (8th Cir. 2007) (internal quotations omitted) (italics in original). "The proper test [for corporate liability under § 1983] is whether there is a policy, custom *or action by those who represent official policy*

that inflicts injury actionable under § 1983." *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 976 (8th Cir. 1993) (italics added). In I*nsley's*, which is cited by SCRC, the Eighth Circuit stated:

> Insley's cannot seriously contend that Smith is attempting to hold it liable under a respondeat superior theory of liability. Jeff Insley represented during his deposition that he was Insley's corporate representative, and it was clear from his testimony that he was the decision-maker with regard to [the underlying constitutional violation]. Jeff Insley's decisions clearly represented the company's "official policy."

*Insley's*, 499 F.3d at 881 n.4. Similarly, Quinn's status as the executive director of SCRC means she represents the official policy of the organization, and SCRC can be liable based on Quinn's actions. Therefore, SCRC is not entitled to summary judgment on Count II.

### iv.   Nogelmeier, Ostrem, Adamson, Langerock, Schmeichel, and Van Hove

There is no evidence that Ostrem entered any of the buildings on Christensen's property on April 9, 2009. Nogelmeier, Adamson, Langerock, Schmeichel, and Van Hove were not present. Christensen has not identified any evidence that any of these defendants knew of Quinn's actions. Because there is no evidence that Nogelmeier, Ostrem, Adamson, Langerock, Schmeichel, or Van Hove personally violated Christensen's rights on April 9, 2009, or that they conspired with Quinn to allow her to search Christensen's outbuildings, they are entitled to summary judgment on Count II.

### 2.   Count I

Count I also alleges a violation of 42 U.S.C. § 1983. Christensen claims that leading up to and during the September 2, 2009, raid on Christensen's property, all defendants conspired to violate Christensen's right to be free from unreasonable searches and seizures. Count I additionally claims that all defendants conspired to deprive Christensen of his right to procedural and substantive due process in violation of the Fifth and Fourteenth Amendments.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* In this case, before the court can consider Christensen's allegations, the court must determine whether Christensen's § 1983 claim stemming from the events of September 2, 2009, should be analyzed under the concept of Fourth Amendment search and seizure, Fourteenth Amendment due process, or both. "Whether a substantive due process right exists is a question of law." *Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002).

" 'As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' " *Oliver*, 510 U.S.

41

at 271-72 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).

"Where a particular Amendment 'provides an explicit textual source of constitutional

protection' against a particular sort of government behavior, 'that Amendment, not

the more generalized notion of 'substantive due process,' must be the guide for

analyzing these claims.' " *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395

(1989)).

Christensen's due process argument is unclear. The amended complaint alleges

that:

> Defendants acted in concert and/or conspired together and committed
> acts designed to deprive Plaintiff Dan Christensen of his property which
> was held and stored under the authority of the Turner County Sheriffs
> [sic] Office as evidence in an ongoing criminal investigation and
> prosecution after it was unlawfully seized on September 2, 2009,
> insomuch as his dogs were removed from his property and the property
> of Plaintiffs David and Kelly Christensen without his consent for an
> unreasonable amount of time and improperly cared for, causing them to
> be permanently altered or destroyed, thereby depriving him of his right
> to Procedural and Substantive Due Process in violation of the Fifth and
> Fourteenth Amendment [sic] to the United States Constitution.

Docket 133 at 22-23. In his numerous briefs, Christensen never consistently relies on

any one theory. Instead, Christensen frames his due process allegations as a failure to

preserve or safeguard evidence in a criminal case, a failure to properly document

evidence during the seizure, a failure to protect the value of his property while it was

in the custody of the defendants, a failure to allow him an opportunity to inspect the

evidence during and immediately following the seizure, falsification of evidence,

failure to include exculpatory information in a search warrant affidavit, and an intentional or reckless failure to investigate. Christensen never identifies any specific procedural rights of which he was deprived, and only provides legal authority for his claims of an intentional or reckless failure to investigate and fabrication of evidence. *See* Docket 383 at 39 (citing *Livers v. Schenck*, 700 F.3d 340, 351-52 (8th Cir. 2012)).

To establish a violation of a substantive due process right, Christensen must show (1) that an official violated one or more fundamental constitutional rights, and (2) that the conduct of the official was shocking to the contemporary conscience. *Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 873 (8th Cir. 2007). "[F]undamental rights are those 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.' " *Id.* (quoting *Terrell v. Larson*, 396 F.3d 975, 978 n.1 (8th Cir. 2005) (en banc)). "[T]he state action must be 'truly egregious and extraordinary' to shock the conscience." *Livers*, 700 F.3d at 351 (quoting *Winslow v. Smith*, 696 F.3d 716, 735-36 (8th Cir. 2012)). Whether conduct shocks the conscience is a question of law. *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 980 (8th Cir. 2013).

Christensen does provide legal authority for the proposition that a reckless investigation can violate the due process clause. *See Livers*, 700 F.3d at 351-52. To establish such a violation, Christensen would have to prove that officials purposely ignored evidence suggesting innocence or used systemic pressure to implicate him in

the face of evidence to the contrary. *Id.* at 351. Although the September 2, 2009, warrants were suppressed, Christensen identifies no evidence of his actual innocence or evidence that pressure to indict Christensen was applied in the face of evidence to the contrary.[17] With respect to the second element of a substantive due process claim, the investigation in this case is not " 'so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.' " *Moran*, 296 F.3d at 647 (quoting *In re Scott Cnty. Master Docket*, 672 F. Supp. 1152, 1166 (D. Minn. 1987)).

Manufacture or fabrication of evidence can violate the Fourteenth Amendment's guarantee of due process. *See Livers*, 700 F.3d at 354. With respect to his claim that evidence was fabricated, Christensen relies on three allegations. First, he claims that law enforcement found a dog skeleton and dog head on Christensen's property on September 2, 2009, but that Quinn did not report seeing anything of the sort when she was there only days before Christensen concludes on that basis that someone must have planted the skeleton and head. *See* Docket 383 at 36 & n.56. Second, Christensen argues a video allegedly shows one door open, but an attorney

---

[17] Christensen frequently asserts that because the motion to suppress in the criminal proceeding was granted, there was no evidence supporting his prosecution, and appears to believe that the suppression itself is evidence of his actual innocence. But the suppression of inculpatory evidence is not the same thing as evidence of actual innocence. Otherwise, every defendant who prevailed on a motion to suppress would have an actionable § 1983 claim. Had the motion to suppress been denied, there would have been evidence to support a prosecution of Christensen for animal neglect, even if that prosecution did not ultimately succeed.

questioned Christensen about why the door was shut, implying that the dogs were cut off from water, food, and shade. *See* Docket 383 at 36 n.56 ("Defendants later lead [sic] Plaintiff to believe the door was shut and questioned him why the door would be shut if the water and shade were inside the building.") On that basis, Christensen concludes that the search team must have shut the door to strengthen the allegations against Christensen. Third, Christensen claims that volunteers at the scene were told to fabricate the conditions of the dogs at Christensen's property. *See, e.g.*, Docket 520 at 55.

The fact that Quinn did not report seeing a dog skeleton or head during her walk around Christensen's property on August 27, 2009, is not surprising given the overgrown nature of the property. Essentially, Christensen is arguing that Quinn should have been more thorough during what he contends was an illegal and trespassory search. The mere fact that the evidence was not discovered until September 2, 2009, is insufficient to create a genuine question as to whether evidence was intentionally fabricated.

Similarly, Christensen identifies no evidence that a member of the search team shut a door that was previously opened in an effort to incriminate Christensen. It is unclear from the video Christensen cites which door is at issue or whether it is open or closed. *See* Docket 361-28 scene 5. The deposition passage cited by Christensen discusses a building with food and water inside, but it focuses on cleaning the kennels,

not whether doors were open. *See* Docket 361-34 at 12. Even if an attorney did question Christensen about an allegedly closed door, such a line of questioning by an attorney in a deposition well after the events occurred would not be evidence that the search team deliberately closed the door. Ultimately, Christensen lacks sufficient evidence to create a factual question of whether the position of the door was intentionally altered as part of a deliberate attempt to incriminate him.

Finally, Christensen refers to two videos from September 2, 2009, where Haisley tells Dr. Byl not to refer to the dogs as in "excellent" condition, but to use the term "overweight," and where Haisley tells Jordan Crump that she should not call the dogs "beautiful" on camera. *See* Docket 361-28 scene 10 (Dr. Byl); Docket 361-28 scene 18 (Crump). In context, the first video shows Haisley telling Dr. Byl to focus on the living conditions of the dogs rather than their physical weight, even mentioning that some of the dogs may be overweight due to the small enclosures in which they were kept. The video does not show Haisley instructing Dr. Byl to fabricate evidence. The second video, which only shows Haisley telling Crump not to call the dogs beautiful, also falls well short of producing a reasonable inference of intentional evidence fabrication. Neither video supports Christensen's allegations of deliberate evidence fabrication, and neither video shows behavior that shocks the conscience.

To be successful on a procedural due process claim, Christensen must show a protected life, liberty, or property interest and an actual deprivation of that interest

without due process of law. *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011); *Flowers*, 478 F.3d at 873. At its core, procedural due process guarantees "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "The circumstances of the deprivation dictate what procedures are necessary to satisfy this guarantee." *Swipies v. Kofka*, 419 F.3d 709, 715 (8th Cir. 2005) (citing *Mathews*, 424 U.S. at 333-34).

Christensen did have a property interest in the dogs seized on September 2, 2009. But he has not pointed to any recognized procedure he was due but did not receive. The procedural defects Christensen does allege, such as the refusal to allow Dr. Hora into the truck with the dogs and the limitation of her time in the fairgrounds to ten minutes, are not tied to any recognized procedural right. Furthermore, Christensen did have the opportunity to be meaningfully heard in the criminal proceeding, and he prevailed there. Finally, Christensen makes no showing that he exhausted the remedies available to him to get the dogs back. *See Lathon v. City of St. Louis*, 242 F.3d 841, 843 (8th Cir. 2001) ("[A] deprivation of property caused by a state official's random and unauthorized conduct does not give rise to a § 1983 procedural due process claim if the state provides an adequate postdeprivation remedy."); SDCL 23A-37-4 ("Any person claiming the right to possession of [seized] property may make application for its return in the office of the clerk of courts for the county in which it is being held.").

Christensen has a fundamental right to be free from unreasonable searches and seizures, but that right has an explicit textual source: the Fourth Amendment. Christensen has not established the substantive due process violations of a reckless investigation or fabrication of evidence. Christensen has not identified any procedure that he was due but did not receive. With respect to the remaining asserted due process rights, Christensen has failed to provide, and the court is unaware of, any authority establishing those rights or classifying them as fundamental. Unlike cases where courts have used a due process framework, the facts here "fit the mold of a typical fourth amendment search and seizure case." *See Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 795 (8th Cir. 1998). Thus, the court will analyze Christensen's claims in Count I under the Fourth Amendment.

### a.    Cunningham

There is no evidence that Cunningham had any role in the events leading up to the September 2, 2009, searches and seizures. Her liability is solely premised on her participation in the alleged conspiracy. For the reasons stated in Count II, Christensen has failed to provide sufficient evidence linking Cunningham to the alleged conspiracy. Because Christensen has failed to identify sufficient evidence showing Cunningham reached an agreement or came to an understanding to participate in the alleged conspiracy, the court does not need to decide whether Cunningham would be

entitled to qualified immunity. Accordingly, Cunningham's motion for summary judgment on Count I is granted.

### b.  Severson

As with Cunningham, Christensen's argument for Severson's individual liability on Count I is premised solely on his alleged involvement in the conspiracy based on the events of April 9, 2009. As discussed in Count II, Christensen has not identified sufficient evidence to support his allegation that Severson conspired with anyone at any time. The court therefore does not reach the question of whether Severson would be entitled to qualified immunity for his role in the alleged conspiracy. Severson's motion for summary judgment on Count I is granted.

### c.  Nogelmeier, Ostrem, Adamson, Langerock, Overby, Schmeichel, and Van Hove

Christensen contends the county commissioners, Nogelmeier, and Ostrem are all liable in their individual capacities for violating his Fourth Amendment rights on September 2, 2009. Specifically, Christensen argues that (1) the county commissioners improperly contracted with SCRC to provide animal control services; (2) Nogelmeier failed to supervise Quinn; (3) Ostrem conspired with others to allow Quinn to illegally search Christensen's property; (4) Ostrem did not promptly file the return for the August 27, 2009, search warrant; (5) Nogelmeier and Ostrem failed to properly supervise the team that removed Christensen's dogs on September 2, 2009; (6) the

49

county commissioners ignored Landeen-Hoeke's alleged incompetence; (7) the county commissioners failed to protect Christensen's property by not authorizing the funding to properly care for the dogs; and (8) Nogelmeier and Ostrem allowed others to improperly exercise the authority of law enforcement. Docket 443 at 2-3.

Christensen identifies no evidence showing that any of the county commissioners, Nogelmeier, or Ostrem knew about the omissions in Quinn's affidavit or any of the other relevant facts in this case. For example, Christensen asserts, without a single citation to any evidence in the record, that:

> Plaintiff would argue that all of the Commissioners were arguably let in on what was taking place at the Fairgrounds days before the September 1st meeting. After all, someone, presumably the Fair Manager, would have had to let Quinn, Thaler and Adams into the building which was presumably locked, in order for them to start hauling supplies and setting up hog crates. Surely, the Fair Manager wouldn't have let them into the building with the thought that they were going to be using the building to house 175 dogs thirty days before the building was scheduled to be rented, without talking to Van Hove and Langerock, the two members of the Commission which [sic] were assigned to the Fair Board. In addition, since Van Hove lived one block from the Fairgrounds, it would have been hard to hide this kind of activity from Van Hove. Surely, Van Hove and/or Langerock would have informed the Commissioners days before September 1st, as to what was taking place at the Fairgrounds.

Docket 443 at 45-46. This is an unsupported chain of speculative arguments with each piece of speculation building on the next, and without some evidentiary support, it cannot survive summary judgment.

Christensen also makes an argument that the county defendants should be liable for a failure to supervise Quinn and others who assisted law enforcement. A supervisor " 'is only liable for his own misconduct' and is not 'accountable for the misdeeds of his agents' under a theory such as respondeat superior or supervisor liability." *Nelson v. Correctional Medical Servs.*, 583 F.3d 522, 534-35 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Supervisors may be liable "only if their deliberate indifference to the offensive conduct and failure to take adequate remedial action proximately caused the injury." *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007). "Deliberate indifference is a 'stringent standard of fault.' " *Id.* (quoting *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 780 (8th Cir. 2001)). "It requires proof of *reckless disregard* of a risk of constitutional harm." *Id.* (italics in original). "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Livers*, 700 F.3d at 356.

In this case, there is no evidence that any of the county defendants knew of the alleged constitutional violations, much less that they were deliberately indifferent to them. For example, Christensen alleges that on August 27, 2009, Ostrem knew that Quinn and Wigg were going to illegally search Dan Christensen's property but did not stop them. Docket 443 at 13 n.24 ("It appears that Ostrem was aware of Quinn and Wigg's intention to unlawfully enter Dan Christensen's property on August 27, 2009 without a warrant, yet he did nothing to prevent them from doing so."). But the

evidence cited does not support that proposition. *See* Docket 446-18 at 1-2 (failing to address whether Ostrem knew anything about the activities of Quinn and Wigg, and indicating that Ostrem did not accompany Quinn and Wigg to Dan Christensen's but remained at David and Kelly Christensen's property). Christensen presents no evidence that any of the county defendants were involved with or knew of the drafts of the affidavits circulated between Quinn and Landeen-Hoeke. Without any evidence showing direct participation or deliberate indifference, Christensen cannot link the county defendants to a constitutional conspiracy. Therefore, the court does not reach the issue of whether the county defendants would be entitled to qualified immunity. The motions for summary judgment by Nogelmeier, Ostrem, Adamson, Langerock, Overby, Schmeichel, and Van Hove on Count I are granted.

### d.    Quinn and SCRC

Christensen contends that Quinn and SCRC violated his Fourth Amendment rights by providing false information to Judge Bjorkman in the process of obtaining a search warrant for his premises. " 'A warrant based on an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth' violates the Fourth Amendment.' " *Small v. McCrystal*, 708 F.3d 997, 1006 (8th Cir. 2013) (quoting *Bagby v. Brondaver*, 98 F.3d 1096, 1098 (8th Cir. 1996)). Truthful information in this context means "that the information put forth is 'believed or appropriately accepted by the affiant as true.' " *Morris v. Lanpher*, 563 F.3d 399, 402 (8th Cir. 2009) (quoting *Franks v.*

*Delaware*, 438 U.S. 154, 165 (1978)). "To prove a 'reckless disregard' [Christensen] must 'show that the omitted material would be '*clearly critical* to the finding of probable cause.' " *Hawkins v. Gage Cnty., Neb.*, No. 13-3107, 2014 WL 3582886, at *7 (8th Cir. July 22, 2014) (italics in original) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). In fact, recklessness may be inferred when the allegedly omitted information would be clearly critical to the finding of probable cause. *Hunter v. Namanny*, 219 F.3d 825, 830 (8th Cir. 2000). Christensen bears " 'the burden of proving the intentional or reckless inclusion of false statements in a warrant affidavit.' " *Morris*, 563 F.3d at 403 (quoting *United States v. Ozar*, 50 F.3d 1440, 1443 (8th Cir. 1995)).

On August 27, 2009, Quinn, Wigg, and Ostrem went to David and Kelly Christensen's property pursuant to a search warrant. *See* Docket 369-16 at 3. The search warrant return that was filed by Ostrem on September 2, 2009, indicated that no property was seized, no one was home at the time the warrant was executed, the conditions of the dogs and kennels appeared "ok," but that the kennels were surrounded by feces and the water appeared contaminated. Docket 369-18. Quinn and Wigg left Ostrem at David and Kelly Christensen's property and proceeded to Dan Christensen's property. *See* Docket 369-16 at 3-4. There, they observed the conditions of Christensen's property. *See id.* at 4. They also located a loose puppy,

which they put back in a kennel where it was subsequently attacked by another dog. *See* Docket 369-15 at 7.

Quinn's initial draft affidavit in support of the September 2 warrants contained information about her inspection of David and Kelly Christensen's property on August 27, 2009. *See* Docket 369-16. But neither of the affidavits that were actually submitted to Judge Bjorkman mentioned the August 27, 2009, search. *See* Docket 369-19; Docket 369-20. Quinn also did not mention anything relating to the August 27, 2009, search during her testimony supplementing the affidavits. Docket 369-22.

Quinn testified that she removed the information relating to the August 27 searches at Landeen-Hoeke's direction. *See* Docket 369-15 at 22; Docket 369-31. Furthermore, Quinn expressed misgivings about the veracity and completeness of the revised affidavits. Docket 369-15 at 22 ("The only thing that bothered me on that was for some reason [Landeen-Hoeke] left the August 27th warrant out of the new information for September 2nd, and I didn't understand that."). Nonetheless, Quinn presented the affidavits to the court and testified without mentioning the August 27, 2009, searches. When ruling on the suppression motion, Magistrate Judge Bern found that material evidence was intentionally omitted from the affidavits in support of the September 2 search warrants; that inclusion of the omitted information would have defeated probable cause because the April 9, 2009, observations were stale and were not otherwise corroborated; that the good faith exception to the exclusionary rule did

54

not apply; and that as a result, the evidence seized on September 2, 2009, should be suppressed. Docket 369-9 at 10-14.

There is sufficient evidence to support a finding that Quinn's omissions were intentional. Quinn knew of the information, was aware it was missing from the revised affidavits, and even expressed concern about the omissions. *See* Docket 369-15 at 22; Docket 369-31. A jury could find from the email exchange between Landeen-Hoeke and Quinn that Quinn and Landeen-Hoeke conspired to mislead a judge into issuing a search warrant. The exchange also tends to show that the omission was more than mere negligence or oversight; it was a deliberate, or at least reckless, effort to present a limited amount of information to the issuing judge to avoid the possibility of a finding that Christensen's Fourth Amendment rights had already been violated. Even though some of the omitted information was inculpatory, the omissions were material and would be of the type that an issuing judge would want to know. A jury could find that Quinn did not believe the affidavits as presented to Judge Bjorkman were true and complete. Furthermore, Quinn's statements indicate that she felt the missing information was critical to a probable cause determination and would be important for an issuing judge to know. *See* Docket 369-15 at 22; Docket 369-31. Therefore, Christensen has identified sufficient evidence to create a genuine question as to whether Quinn's affidavits contained a reckless disregard for the truth and thereby violated his Fourth Amendment rights.

Quinn would still be "entitled to qualified immunity if [her] affidavit, supplemented by the omitted facts, still supports a probable cause finding." *Block v. Dupic*, No. 13-2889, 2014 WL 3409039, at *2 (8th Cir. July 15, 2014). "Probable cause for a warrant exists only when the totality of the circumstances provides sufficient facts to lead a prudent person to believe there is a fair probability that contraband or other evidence of a crime will be found. *Hunter*, 219 F.3d at 830 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "It is axiomatic that probable cause must exist at the time of the search and not merely at some earlier time." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) (quoting *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998)).

Quinn argues that conditions on Christensen's property to which she testified before the issuing judge would support a probable cause determination. Docket 597 at 17. In reconstructing an affidavit, the court omits all false information and includes omitted information. *See Hunter*, 219 F.3d at 829-30. In this case, the reconstructed September 2, 2009, affidavit would have contained the following: Quinn's testimony of what she saw on April 9, 2009; the fact that Quinn was not on Christensen's property on April 9, 2009, pursuant to a search warrant; the fact that Quinn received a report of a sick Weimaraner puppy on August 13, 2009; and the fact that Quinn and Wigg went to Christensen's property on August 27, 2009, and returned a loose puppy

to a kennel but made no other incriminating observations. See Docket 369-15 at 6 (describing Quinn's actions at Christensen's property on August 27, 2009).

The information from April 9, 2009, was nearly five months old at the time Quinn applied for the search warrants at issue. "There is no fixed formula for determining when information has become stale." *United States v. Smith*, 266 F.3d 902, 904 (8th Cir. 2001) (discussing information ranging from four months to three years old). But there is evidence that Quinn spoke to Christensen about the conditions on his property after he returned on April 9, 2009, and Christensen agreed to clean up his property. *See* Docket 369-35. Quinn was on Christensen's property on August 27, 2009, and she testified only that she found a loose puppy and noticed a foul smell at the property. *See* Docket 369-15 at 6-8. The report of the sick Weimaraner related to David and Kelly's property, not Christensen's farm.

The April 9, 2009, observations are stale because they are not corroborated by Quinn's observations from August 27, 2009. The likelihood of evidence of a crime being discovered is lessened by Christensen's statements that he would remedy the conditions Quinn observed on April 9, 2009. The sick Weimaraner and the conditions at David and Kelly's property are not tied to Christensen's property. Based on the totality of the circumstances, probable cause did not exist for the September 2, 2009, warrant for Christensen's property. Similarly, Magistrate Judge Bern found that the reconstructed affidavit did not establish probable cause. Docket 369-9 at 11-13.

Quinn also argues that she did not need a warrant because she could have seized the animals due to exigent circumstances. Docket 474 at 20-21. The court is not persuaded that exigent circumstances existed because Quinn waited sixteen days from the time she received the report of the sick puppy on August 17, 2009, and six days from her search of the properties on August 27, 2009, before applying for a warrant. Additionally, Quinn had no evidence linking the sick Weimaraner to Christensen's property, rather than David and Kelly's property. And even if exigent circumstances would justify a warrantless seizure, that ability would not confer upon Quinn the power to obtain a warrant through false or misleading statements.

The warrant for Christensen's property on September 2, 2009, was based on Quinn's affidavit containing a reckless disregard for the truth. Because the reconstructed affidavit did not establish probable cause, Quinn is not entitled to qualified immunity on that basis.

Quinn argues that she relied on the advice of Landeen-Hoeke, which should establish that her actions were reasonable. Docket 474 at 22-23 (citing *Folkerts v. City of Waverly*, 707 F.3d 975, 982 (8th Cir. 2013)). *Folkerts* involved a due process challenge against an investigator's filing of a complaint against a man with a severe intellectual disability after interviewing him. *See Folkerts*, 707 F.3d at 979. In that case, the Eighth Circuit held that the officer's charging decision did not shock the conscience because

there was no case interpreting an element in question and the fact that the officer consulted an attorney showed the reasonableness of the action taken. *Id.* at 982.

In this case, although Quinn spoke with an attorney, it was not reasonable for her to omit the evidence from her affidavit. Quinn stated that she did not understand why the evidence would be omitted. Additionally, omitting material information from a search warrant affidavit is not a gray area of the law or one in which an attorney's advice should be needed. It would be clear beyond debate to a reasonable official in Quinn's position that the omitted information should have been included.

Christensen has presented evidence that Quinn conspired to violate his Fourth Amendment rights when she submitted an affidavit for a search warrant that was based on a reckless disregard for the truth. Because the reconstructed affidavit did not demonstrate probable cause, and because a reasonable officer would have known the omissions violated the law, Quinn is not entitled to qualified immunity.[18] Therefore, the motion for summary judgment on Count I by Quinn and SCRC is denied.

---

[18] The court recognizes the incongruity of granting absolute immunity to a prosecutor who presumably knows the law, and denying qualified immunity to the officer who relied on the legal advice of the prosecutor. *See generally Buckley v. Fitzsimmons*, 509 U.S. 259, 275 n.6 (1993). Absolute immunity shields the role of the prosecutor from fear of civil liability and helps ensure the integrity and independence of the office. Although absolute immunity may, in some circumstances, shield prosecutors in a way that does not advance those goals, *see Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 580 (8th Cir. 2006) ("Even if Goldman knowingly presented false, misleading, or perjured testimony, or even if he withheld or suppressed exculpatory evidence, he is absolutely immune from suit."), that is a necessary price to pay for a legal system in which prosecutors may exercise discretion in the discharge of

###### e.    Haisley

Only persons acting under the color of state law can be liable under § 1983. *Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008). In *Crawford*, which is controlling here, the Pulaski County Humane Society and the Beebe Humane Society assisted state officials in removing allegedly neglected dogs from a kennel. The Eighth Circuit treated those defendants as private parties assisting the state actors. *See Crawford*, 678 F.3d at 670. The court can discern no meaningful difference between the role played by Haisley here and the role played by the humane society defendants in *Crawford*. Accordingly, the court will treat Haisley as a private party. Christensen relies on numerous cases from the Ninth Circuit that reach a different conclusion. *See* Docket 554 at 16-22. Because those decisions are not binding on this court, unlike *Crawford* which is, they will not be discussed.

"Because a section 1983 claim applies to state action, and the defendants are private citizens, [Christensen] 'must establish not only that a private actor caused a deprivation of constitutional rights, but that the private actor willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy.' " *Id.* (quoting *Dossett v. First State Bank*, 399 F.3d 940, 951

---

professional duties without fear of reprisal. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 340 (2009) ("[A] prosecutor's absolute immunity reflects 'a balance' of 'evils.' . . . '[I]t has been thought in the end better . . . to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.' " (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949))).

(8th Cir. 2005)). To demonstrate Haisley's culpability, Christensen argues that Haisley: was concerned with generating media coverage of the seizure (Docket 554 at 24); filmed the seizure (Docket 554 at 25); failed to use proper biosecurity measures (Docket 554 at 26); prevented Christensen's veterinarian from examining the dogs at the fairgrounds (Docket 554 at 26); manufactured evidence (Docket 554 at 27); should have known the warrants were invalid (Docket 554 at 30-31); and had an agenda to drum up donations for HSUS (Docket 554 at 33).

"An officer's subjective intent is irrelevant to the question of whether her or his conduct violated a constitutional right by exceeding the scope of a warrant. Indeed, an officer's subjective intent is never relevant under a Fourth Amendment analysis, so long as an objective basis for the seizure exists." *McClendon v. Story Cnty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005). "[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . ." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). A warrant "does not end the inquiry into objective reasonableness. Rather, we have recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.' " *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[T]he threshold for establishing this exception is a high one, as it should be." *Id.*

It is undisputed in this case that a judge issued warrants for the seizure of Christensen's dogs. Christensen has failed to identify evidence showing that Haisley had any knowledge of, or role in, Quinn's affidavits or her testimony. Based on the condition of the properties, a reasonable officer could conclude that a seizure of all animals was appropriate. The warrants were facially valid, and Haisley is not required to independently review the finding of the issuing judge regarding probable cause. This is not one of the few cases in which the circumstances would justify a finding that Haisley could not rely on the warrant.

Because Haisley had an objectively reasonable basis for the seizure of the animals, his subjective opinions on breeding, the media, and the alleged agenda of HSUS are not relevant. Documenting the seizure,[19] preventing Dr. Hora from riding in the trucks and from spending more than ten minutes at the fairgrounds, and failing to use biosecurity protocols are not constitutional violations. Christensen has not identified evidence sufficient to create a genuine question as to whether Haisley fabricated evidence.

---

[19] Christensen likens this case to *Wilson v. Layne*, 526 U.S. 603 (1999), in which the Supreme Court found that media ride-alongs violate the Fourth Amendment because the news crew was not there to assist police and was solely there for unrelated purposes. In this case, the people filming the seizure were part of an organization assisting law enforcement with the execution of the warrant. The documentation of the conditions served a legitimate law enforcement purpose, namely to document the conditions of the properties in the event of a legal challenge to the seizure. As a result, Christensen himself designates many of these videos as evidence in this matter. *See* Docket 361-28.

Christensen has not identified any evidence to show that Haisley joined an agreement or understanding to unlawfully deprive Christensen of his rights. Haisley acted in an objectively reasonable manner in relying on the warrants. The remaining actions Christensen alleges do not amount to constitutional violations. Because there is no evidence connecting Haisley to the alleged constitutional conspiracy, the court does not reach the issue of whether Haisley is entitled to qualified immunity. Haisley's motion for summary judgment on Count I is granted.

### f.    HSUS and Pacelle

Like Haisley, HSUS and Pacelle are private parties. *Crawford*, 678 F.3d at 670. Christensen must show that they willfully participated with state officials in a deprivation of constitutional rights and reached a mutual understanding concerning the unlawful deprivation of rights. *Id.* There is no evidence showing that either HSUS or Pacelle knew anything about Quinn's omissions from the affidavits. There is no evidence that HSUS or Pacelle knew about a potential violation of Christensen's Fourth Amendment rights, much less that they reached a mutual understanding concerning an unlawful objective.

Christensen argues that the creation of the disaster response team can sustain liability against Pacelle and HSUS. Docket 383 at 18. The existence of a disaster response team is not probative of whether there was an agreement or understanding in this case, nor is it unconstitutional by itself. Because there is no link between the

disaster response team and the constitutional violation alleged in this case, the disaster response team's existence does not show a constitutional conspiracy.

Christensen also contends that HSUS and Pacelle should have conducted an independent investigation to ensure the legality of the seizure. Docket 383 at 40 (labeling the lack of independent investigation as a violation of Christensen's due process rights). As discussed with respect to Haisley, the individuals who seized Christensen's dogs on September 2, 2009, did so under the authority of a facially valid warrant signed by a judge. Quinn's omissions would not have been known to a reasonable officer examining the warrant, and they certainly would not have been known to Pacelle, who was not at the property. There is no other basis for assuming the warrants were invalid. The high threshold for showing that it would have been obvious to a reasonably competent officer that the warrant should not have issued is not met in this case. HSUS and Pacelle were not under an obligation to independently investigate and review the judicial determination of probable cause.

Christensen asserts that HSUS and Pacelle played some role in the fabrication of evidence on September 2, 2009. See Docket 383 at 40-41. As discussed above, there is insufficient evidence to support this theory.

In an attempt to impose supervisory liability on Pacelle, Christensen argues that Pacelle was deliberately indifferent to unconstitutional acts committed by his subordinate Haisley and that he failed to take sufficient remedial action. Docket 383 at

30-32. The court determined that Haisley did not commit any constitutional violations in this case; therefore, there is no underlying constitutional violation for which Pacelle might be responsible.

Because there is no evidence that HSUS or Pacelle knew of the constitutional violations alleged in this case, they did not conspire with any state actors to cause such violations. The court does not reach the issue of whether HSUS and Pacelle enjoy qualified immunity. Accordingly, HSUS and Pacelle are entitled to summary judgment on Count I.

### g.    UAN

Christensen names UAN as a defendant in Count I, alleging § 1983 violations on September 2, 2009. The parties agree that UAN volunteers were responsible for setting up the shelter at the Turner County Fairgrounds but did not enter Christensen's property or the property belonging to David and Kelly Christensen. *See* Docket 338 at 4-5; Docket 359 at 4-5 (acknowledging that UAN staff members were in charge of the shelter at the fairgrounds, did not go to either property in question on September 2, 2009, and that all UAN volunteers were gone by September 7, 2009).

Because UAN is a private party,[20] Christensen is required to show that UAN willfully participated with state officials in a deprivation of constitutional rights and

---

[20] As with HSUS, Christensen argues that UAN is a state actor rather than a private actor. *See* Docket 359 at 30-34. *Crawford* is on point and controls on this issue. *Crawford*, 678 F.3d at 670.

reached a mutual understanding concerning the unlawful deprivation of rights. *Crawford*, 678 F.3d at 670. Christensen argues that it should have been obvious to Quinn that the September 2, 2009, warrants were defective. Docket 359 at 38 ("[I]t was blatantly obvious to [Quinn] that the warrants obtained . . . were not facially valid."). Although Christensen devotes several paragraphs in his brief to this allegation detailing Quinn's knowledge, he does not identify any evidence tending to show that UAN knew of any problems with the warrants. For the reasons discussed above with respect to Haisley, Pacelle, and HSUS, the presence of a facially valid warrant is strong evidence that UAN acted in an objectively reasonable manner.

Christensen argues that UAN instructed volunteers on how to record evidence to fabricate a case against Christensen. Docket 359 at 41-42. First, the statements Christensen cites for this proposition came from Haisley, not anyone associated with UAN. Second, despite Christensen's frequent invocation of the statements about how to record the conditions of the dogs, those statements do not create a genuine question as to whether UAN actually fabricated or agreed to fabricate evidence.

Last, Christensen argues that UAN had an agenda that motivated its participation in the raid on Christensen's property. Docket 359 at 42-43. Christensen cites a Supreme Court decision that held that inviting a news crew to cover a search was a violation of the Fourth Amendment. *See id.* (citing *Wilson v. Layne*, 526 U.S. 603 (1999)). But *Wilson* is easily distinguishable from the case at bar. *Wilson* addresses

instances in which the presence of the third parties does not aid in the execution of the warrant. *Wilson*, 526 U.S. at 611-12. The private entities in this case were assisting law enforcement in the execution of a facially valid warrant. The fact that UAN conducts fundraising activity or has a public agenda does not transform its actions into constitutional violations.

Christensen has not identified evidence showing that UAN conspired to violate his constitutional rights. Therefore, the court does not reach the issue of qualified immunity. UAN is entitled to summary judgment on Count I.

### h.     Drs. Bauknecht and Dale

Christensen alleges in Count I that Drs. Bauknecht and Dale, in their individual capacities, conspired to deprive him of his constitutional rights. Christensen must show that Drs. Bauknecht and Dale conspired with state actors to deprive Christensen of his constitutional rights. *Crawford*, 678 F.3d at 670.

Christensen points to several facts in an effort to demonstrate that Drs. Bauknecht and Dale joined the alleged conspiracy. He argues that Dr. Dale provided misleading testimony before the grand jury in the subsequent criminal case by covering up the overall health of the dogs and by failing to disclose her affiliation with SCRC. Docket 375 at 23. But Dr. Dale did disclose her relationship with SCRC during her testimony. *See* Docket 408 at 13 n.8. Additionally, even viewed in the light most favorable to Christensen, Dr. Dale's grand jury testimony regarding the health of

67

individual dogs is insufficient to create a genuine factual issue as to whether Dr. Dale fabricated evidence when she examined dogs at the Turner County Fairgrounds.[21]

Christensen also argues that Dr. Bauknecht had worked for UAN on other operations before coming to Turner County, and that he was friends with Janell Matthies. *See* Docket 375 at 25. Christensen further states that Dr. Bauknecht was not licensed to practice as a veterinarian in South Dakota and "[b]ringing in a young, newly licensed veterinarian . . . from Wisconsin to 'do nothing more than examine dogs in order to treat them' seems very unlikely." *Id.* at 25 n.47. Based on that evidence, Christensen argues that Dr. Bauknecht's bias is clear and creates a triable question of fact. But this evidence is insufficient to create a factual question regarding Dr. Bauknecht's participation in a conspiracy without resort to speculation and assumptions.

Christensen also argues that both Drs. Dale and Bauknecht knew they were acting in an investigatory role. *Id.* at 22. He claims "[Drs. Bauknecht and Dale] were

---

[21] Christensen primarily relies on a letter provided by Dr. Rentschler, which states that most of the dogs he examined were in good shape. Although the court does not weigh the credibility of evidence at the summary judgment stage, the court observes that Dr. Rentschler's letter is dated August 30, 2009, and describes the confiscation of dogs from a puppy mill that occurred on August 26, 2009. *See* Docket 361-53. The events at question here occurred on September 2, 2009. With respect to Christensen's claim that the defendants deliberately kept inadequate records, Dr. Rentschler himself writes that "[d]etailed individual records were kept on the findings of every exam I performed . . . ." *See id.* Although Christensen seems to take issue with how the veterinarians and volunteers documented their findings and the terminology they used, that does not equate to the manufacture or fabrication of evidence.

biased, were deriving commercial gain from their involvement, and they did not perform examinations of Dan Christensen's dogs for the purpose of treatment as they state." *Id.* at 32. In response to the sworn affidavits of Drs. Dale and Bauknecht that they could not have joined a conspiracy to violate Christensen's rights because they did not know he was the focus of the investigation and raid, Christensen states: "Plaintiff would argue that considering how Defendants place so much weight on 'not knowing Plaintiff's identity' it is almost as if they intended from the beginning, prior to their involvement, to avoid requesting such so they could blow that fact substantially out of proportion later when sued." *Id.* at 44 n.62.

These arguments by Christensen are wholly speculative and lack evidentiary support. Christensen fails to offer any evidence that Dr. Bauknecht or Dr. Dale derived financial gain from their roles in the raid, that they knew anything about the April 9, 2009, arrest warrant, that they knew about Quinn's conduct in obtaining the September 2, 2009, warrants, or that they even knew the subject or purpose of the September 2, 2009, raids. Without any evidence tending to show that either Dr. Bauknecht or Dr. Dale willfully participated and reached a mutual understanding to deprive Christensen of a constitutional right, they cannot be liable under § 1983. The court need not reach the issue of qualified immunity. Because Christensen has failed to identify specific facts that create a genuine issue for trial, Drs. Bauknecht and Dale are entitled to summary judgment on Christensen's claim in Count I.

### i.  Landeen-Hoeke

Before examining the merits of Christensen's individual capacity claim against Landeen-Hoeke, the court must determine whether Landeen-Hoeke is entitled to absolute immunity. "Prosecutors are absolutely immune from suits for damages arising out of their official duties in initiating and pursuing criminal prosecutions." *Williams v. Hartje*, 827 F.2d 1203, 1208 (8th Cir. 1987) (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)). This immunity is available even if the prosecutor's actions are "patently improper." *Id.* "Immunity is not defeated by allegations of malice, vindictiveness, or self-interest." *Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 580 (8th Cir. 2006). "[A] prosecutor is absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts." *Id.*

"[A]bsolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33). In determining whether a prosecutor's actions are part of her official duties or are investigative or administrative, courts evaluate the nature of the function performed. *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997). Activities that are "intimately associated with the judicial phase of the criminal process" are protected by absolute immunity. *Van de Kamp*, 555 U.S. at 342-43 (quoting *Imbler*, 424 U.S. at 430).

70

Acts that are not associated with the prosecutor's role as advocate in the judicial process are protected by qualified immunity. *See Kalina*, 522 U.S. at 126.

It can be difficult to distinguish between prosecutorial and investigative activities because "[p]reparation for initiation of the criminal process involves investigative work mixed with prosecutorial decision-making." *Williams*, 827 F.2d at 1210. " 'Not all of an advocate's work is done in the courtroom. For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation.' " *Reasonover*, 447 F.3d at 580 (quoting *Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir. 1980)). Investigative or administrative acts, particularly those that "require legal knowledge and the exercise of related discretion," can still be directly connected with a prosecutor's function as an advocate and therefore protected by absolute immunity. *See Van de Kamp*, 555 U.S. at 344.

Christensen alleges that Landeen-Hoeke was the mastermind of the conspiracy against Christensen. *See* Docket 484 at 51 ("Clearly evidence supports the conclusion that this was indeed 'her deal.' "). According to Christensen, Landeen-Hoeke:

> [E]ngaged in overt acts in furtherance of the conspiracy to seize Dan Christensen's dogs when she: initiated the investigation on or about April 8, 2009; when she completely re-wrote Quinn's September 2, 2009 Affidavits; when she purposely removed material information and excluded the findings from the August 27, 2009, search at David Christensen's property; and refused payment from the County to pay for the care of Dan Christensen's dogs while in the custody of Second Chance.

Docket 484 at 50. Christensen contends those acts fall outside of the scope of Landeen-Hoeke's role as a prosecutor and that she is not entitled to absolute immunity for those acts.

### i.        April 8 and 9, 2009

With respect to the investigation on April 8 and 9, 2009, Landeen-Hoeke's alleged act of initiating the investigation is comprised of several separate acts.[22] First, Christensen claims Landeen-Hoeke passed information from Quinn to Cunningham regarding Christensen's business. Docket 484 at 33, 51. Second, Christensen claims Landeen-Hoeke requested that Cunningham provide an affidavit so Landeen-Hoeke could request an arrest warrant for the misdemeanor charge. Docket 484 at 34. Third, according to Christensen, the individuals involved on April 9, 2009, met in Landeen-Hoeke's office before going to Christensen's property.[23] Docket 484 at 34. Finally, Christensen points to Quinn's deposition testimony where Quinn stated that Landeen-Hoeke mentioned that service of the arrest warrant and three-day notice was a good opportunity to check Christensen's property for evidence of allegations of neglect. Docket 484 at 7 n.12.

---

[22] Although Christensen does not name Landeen-Hoeke as a defendant in Count II, her actions on April 9, 2009, are still relevant in determining whether she joined a conspiracy.

[23] Christensen contends that Landeen-Hoeke put together a "search party," but does not provide support for that proposition in the record. Rather, Christensen cites to evidence showing that the people involved met at the courthouse, but not that Landeen-Hoeke organized them there. *See* Docket 484 at 3-7.

Landeen-Hoeke's request for a warrant is protected by absolute immunity. *See Van de Kamp*, 555 U.S. at 343. Even if the court considers Landeen-Hoeke's actions in passing along the suspected sales tax violation to Cunningham and telling Quinn to look around Christensen's property and the fact that the officials met at the courthouse on April 9, 2009, as outside her role as a prosecutor, she would still be entitled to qualified immunity.

Landeen-Hoeke's actions related to the sales tax investigation were not objectively unreasonable in light of clearly established legal rules at the time. *See Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) ("What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." (internal quotation marks omitted)). Specifically, it would be reasonable for an official to refer a sales tax complaint to the South Dakota Department of Revenue. Furthermore, it would be reasonable for the various parties to meet at the Turner County Courthouse before proceeding to Christensen's property.

The only action by Landeen-Hoeke from April 2009 that raises a constitutional concern is her alleged statement to Quinn that Quinn should use the opportunity to look around Christensen's property. But it is far from clear that Landeen-Hoeke

73

instructed Quinn to violate Christensen's Fourth Amendment rights. Quinn could look around from Christensen's driveway and observe what was in plain view on his property. Furthermore, although the right to privacy in one's home is clearly established, it is also clear that officers may search open fields without a warrant. It is well established that " 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " *Littrell*, 388 F.3d at 582 (quoting *Maciarello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). Even if the court assumes that Landeen-Hoeke made the statement to Quinn as Christensen claims, or was motivated by a personal animosity against Christensen, her actions would not have been clearly unconstitutional. "The relevant question . . . is . . . whether a reasonable officer could have believed [the conduct in question] to be lawful, in light of clearly established law and the information [she] possessed. [Her] subjective beliefs about the [conduct] are irrelevant." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Therefore, Landeen-Hoeke is immune from suit for her actions in April 2009.

### ii.     Search Warrant Application

Next, the court turns to Landeen-Hoeke's actions in connection with the affidavits in support of the search warrant application. Landeen-Hoeke's appearance in court in support of the search warrant applications is protected by absolute

immunity.[24] *See Van de Kamp*, 555 U.S. at 343 ("In the years since *Imbler*, we have held that absolute immunity applies when a prosecutor . . . appears in court to present evidence in support of a search warrant application[.]"); *see also Burns v. Reed*, 500 U.S. 478, 492 (1991) ("[W]e hold that respondent's appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing are protected by absolute immunity."). Similarly, Landeen-Hoeke is entitled to absolute immunity for her actions in assisting Quinn draft the affidavits for the search warrant applications. *See Kalina*, 522 U.S. at 129 ("These cases make it quite clear that petitioner's activities in connection with the *preparation* and filing of two of the three charging documents—the information and the motion for an arrest warrant—are protected by absolute immunity. Indeed, except for her act in personally attesting to the truth of the averments in the certification, it seems equally clear that the *preparation* and filing of the third document in the package was part of the advocate's function as well." (italics added)). Landeen-Hoeke is entitled to absolute immunity for her actions relating to the warrants on September 2, 2009.

---

[24] Christensen argues that Landeen-Hoeke intentionally misled the court when she failed to correct Quinn's assertion that the April 9, 2009, visit to Christensen's property was authorized by a search warrant rather than an arrest warrant. Even if Christensen's accusation that Landeen-Hoeke misled the court were true, she still enjoys absolute immunity for her acts as an advocate. *See Reasonover*, 447 F.3d at 580 ("Even if Goldman knowingly presented false, misleading, or perjured testimony, or even if he withheld or suppressed exculpatory evidence, he is absolutely immune from suit.").

### iii.    Continuing Prosecution

The final overt act alleged by Christensen is that Landeen-Hoeke "refused payment from the County to pay for the care of Dan Christensen's dogs while in the custody of Second Chance." Docket 484 at 50. To support this allegation, Christensen states:

> Lastly, Landeen-Hoeke acted in furtherance of the conspiracy when she told Quinn that they had to continue on with a prosecution or Quinn would not be paid for taking care of Dan Christensen's dogs that they had illegally seized on September 2, 2009. Landeen-Hoeke knew very well that under South Dakota Law [sic] the County had a responsibility to safeguard and maintain evidence collected. Landeen-Hoeke was also well aware that the contract entered into between Second Chance and Turner County provided for payment to care for animals seized in Turner County pursuant to the contract.

*Id.* at 53. Christensen's argument on this point, reproduced above in its entirety, is devoid of any citations to the record. It also fails to refer to any legal authority. The court construes this argument as alleging an improper continuation of a prosecution. Landeen-Hoeke would be entitled to absolute immunity for exercising her discretion to continue a prosecution, or deciding whether certain evidence would lead to a prosecution, or determining when penalties such as restitution might be available. *See Van de Kamp*, 555 U.S. at 344 (giving absolute immunity to activities requiring "legal knowledge and the exercise of related discretion"). Therefore, Landeen-Hoeke enjoys immunity for the final overt act alleged by Christensen.

### iv.    Other Acts

At various points in his brief, Christensen alleges numerous other acts by Landeen-Hoeke that were not included in his list of the acts Landeen-Hoeke took in furtherance of the alleged conspiracy. Those actions include: not reporting the upcoming raid at the county commission meeting on September 1, 2009; contacting Van Hove to request the use of the fairgrounds; working on a press release with Jordan Crump; refusing to let Christensen's veterinarian visit the dogs at the fairgrounds; instructing volunteers on how to collect evidence; working to require that all kennels be licensed; and telling Quinn that even if Christensen got his dogs back he would not be able to get a breeder's license.

First, each of these allegations, without more, would not amount to a constitutional violation. Second, Christensen fails to adequately develop and support each, both with legal authority and factual support. *See, e.g.*, Docket 484 at 42 (containing an email from one HSUS employee to another repeating what Quinn said Landeen-Hoeke had told her about Christensen's ability to get a breeder's license). Even if the court assumes that Landeen-Hoeke is only entitled to qualified immunity for those acts, Christensen would still have the burden of showing that the act in question violated a clearly established constitutional right. See *Smith v. City of Minneapolis, Minn.*, 754 F.3d 541, 546 (8th Cir. 2014) (" 'Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff

must demonstrate that the law was clearly established.' " (quoting *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007))). Christensen does not cite, and the court is not aware of, any authority that clearly establishes that Landeen-Hoeke's alleged conduct was unconstitutional. Accordingly, Christensen has not met his burden and Landeen-Hoeke is immune from suit on Count I.

## II.   STATE-LAW CLAIMS

Counts III-VII allege state-law claims over which this court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1367(a). There are four specific instances in which a federal court can decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c). In this instance, the court has not dismissed all claims over which it has original jurisdiction, and none of the other specified grounds exists. Accordingly, the court exercises supplemental jurisdiction over the state-law claims. *McLaurin v. Prater*, 30 F.3d 982, 985 (8th Cir. 1994). A federal court exercising supplemental jurisdiction over state-law claims applies state substantive law to those claims. *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 624 n.9 (8th Cir. 2003).

### A.   Count III: Malicious Prosecution

In Count III, Christensen alleges that all defendants conspired to commit the tort of malicious prosecution. To prevail on a claim for malicious prosecution under South Dakota law, a plaintiff must show "(1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present

defendant against plaintiff, who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damage conforming to legal standards resulting to plaintiff." *Heib v. Lehrkamp*, 704 N.W.2d 875, 884 n.8 (S.D. 2005) (quoting *Just v. Martin Bros. Co.*, 159 N.W. 44, 46 (S.D. 1916)).

"The third element of the tort of malicious prosecution, a bona fide termination of prior proceeding in [Christensen's] favor, 'is a question of law normally to be determined by the trial court . . . .' " *Schwartz v. First Nat'l Bank in Sioux Falls*, 390 N.W.2d 568, 571 (S.D. 1986) (quoting *Brown v. Carr*, 503 A.2d 1241, 1245 (D.C. 1986)). " '[A] termination must reflect on the innocence of the accused party with respect to the alleged wrong conduct.' " *Id.* (quoting *Berman v. RCA Auto Corp.*, 177 Cal. App. 3d 321, 323 (1986)). The *Schwartz* court found that a nolo contendere plea was not a bona fide termination in favor of the accused party. *Id.* In *Brown*, the court stated that if a dismissal is "on technical grounds [or] for procedural reasons . . . it does not constitute favorable termination." *Brown*, 503 A.2d at 1245.

In this case, the charges against Christensen were dismissed after the evidence supporting the state's case was suppressed. Suppression of evidence does not demonstrate Christensen's innocence of the underlying charges. Rather, it is a technical determination that the proper procedures for acquiring a warrant were

circumvented. Therefore, Christensen cannot show a substantive termination in his favor that reflects his innocence.

The second element of malicious prosecution requires that the defendant be the legal cause of the prosecution. "The rule requiring proof of legal causation . . . [means] 'a person cannot be liable for malicious prosecution if the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, *unless* the person provides information which he knows is false.' " *Danielson v. Hess*, 807 N.W.2d 113, 117 (S.D. 2011) (emphasis in original) (quoting *King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003)). Christensen was indicted by a grand jury, which is evidence that there was probable cause for the criminal charges. *See Heib*, 704 N.W.2d at 887. The false statements by Quinn were not made to the grand jury, they were made to the judge issuing the warrant. Christensen identifies no evidence that any false statements were made to the grand jury, which made the decision to indict him. Because the grand jury indicted Christensen, he cannot show that a defendant's false statement was the legal cause of his prosecution.

Christensen has not met his burden of proof on either the second or the third element of malicious prosecution. Accordingly, all defendants are entitled to summary judgment on Count III.

### B.      Count IV: Intentional Infliction of Emotional Distress

In Count IV, Christensen alleges that all defendants conspired with others to commit the tort of intentional infliction of emotional distress.[25] To prevail on his claim, a plaintiff must establish that the defendant "(1) by extreme and outrageous conduct, (2) acted intentionally or recklessly to cause the plaintiff severe emotional distress, (3) which conduct in fact caused the plaintiff severe distress, and (4) the plaintiff suffered an extreme, disabling emotional response to the defendant's conduct." *Harris v. Jefferson Partners, L.P.*, 653 N.W.2d 496, 500 (S.D. 2002). "Proof under this tort must exceed a rigorous benchmark. The conduct . . . must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Whether conduct is "extreme enough to permit recovery" is a question of law. *Reeves v. Reiman*, 523 N.W.2d 78, 83 (S.D. 1994).

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which

---

[25] In his brief in support of his final motion for summary judgment, Christensen attempts to change his theory of recovery on Count III to abuse of process. *See* Docket 552 at 87-89. This case has proceeded for four years, and through motions for summary judgment by all defendants, as an intentional infliction of emotional distress claim. Christensen cannot adopt a new theory at this stage of the case. The court will not address the unpleaded abuse of process claim.

would entitle the plaintiff to punitive damages for another tort." Restatement

(Second) of Torts § 46 cmt. d (1965). The only defendants whose conduct comes

close to that high standard are Quinn and Landeen-Hoeke. Their actions, while

questionable, possibly tortious, and found by Magistrate Judge Bern to be

unconstitutional, do not go beyond all possible bounds of decency. The rigorous

benchmark has not been met in this case, and all defendants are entitled to summary

judgment on Count IV.

### C.    Count V: AEPA Violation

In Count V, Christensen alleges that all defendants are liable for violating South

Dakota's Animal Enterprise Protection Act. The AEPA states that no person may:

> (1)    Intentionally damage or destroy an animal facility, an animal, or property in or on the animal facility, or obstruct any enterprise conducted at the animal facility;
> (2)    Acquire or otherwise exercise control over an animal facility or an animal or other property from an animal facility with the intent to deprive the owner or to obstruct the enterprise conducted at the facility;
> (3)    Enter an animal facility, not then open to the public, with intent to commit any act prohibited by this section;
> (4)    Enter an animal facility and remain concealed, with intent to commit any act prohibited by this section;
> (5)    Enter an animal facility and commit or attempt to commit any act prohibited by this section; or
> (6)    Intentionally turn out or release any animal in or on an animal facility.

SDCL 40-38-2. A person may also violate the AEPA by entering and remaining in an

animal facility "if the person had notice that the entry was forbidden or received

82

notice to depart but failed to do so." SDCL 40-38-3. The AEPA explicitly states that it "does not apply to lawful activities of a governmental agency carrying out its duties under law." *Id.; see also* SDCL 40-38-2. A violation of the AEPA exposes the violator to criminal penalties. SDCL 40-38-4. In addition to criminal penalties, the AEPA also provides for damages. SDCL 40-38-5 ("Any person who has been damaged by reason of violation of this chapter may bring an action in the circuit court against the person causing the damage to recover an amount equal to three times all actual and consequential damages. Such person may also recover his court costs and reasonable attorney's fees.").

All defendants argue as a threshold matter that they cannot be liable for damages or attorney's fees under SDCL 40-38-5 because no defendant has been convicted of violating the AEPA. The South Dakota Supreme Court has not interpreted the AEPA or its civil damages section. " 'When there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the [same issue] before us.' " *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010) (alteration in original) (quoting *Northland Cas. Co. v. Meeks*, 540 F.3d 869, 874 (8th Cir. 2008).

Defendants point to a decision by the South Dakota Supreme Court that interpreted a similar statute to require an underlying criminal conviction before a civil action could proceed. *See K & E Land & Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 531-32

(S.D. 1983). In *K & E*, the defendant was found liable for intentional damage to private property, and the plaintiff was awarded treble damages. The basis for the treble damages award was SDCL 22-34-2,[26] which provided that "[a]ny person who violates § 22-34-1, in addition to the punishment prescribed therefor, is liable in treble damages for the injury done, to be recovered in a civil action by the owner of the property or public officer having charge thereof." The South Dakota Supreme Court held that treble damages were not recoverable under SDCL 22-34-2:

> A threshold problem exists with the application of SDCL 22-34-1 and SDCL 22-34-2 herein. SDCL 22-34-1 is a criminal statute. Thus, *if* appellant Mayer would have been prosecuted under SDCL 22-34-1, he would have had the safeguards of the criminal burden of proof and criminal procedure. . . . While it is undisputed that the same act can be the basis of both a tort and a crime, SDCL 22-34-2 is dependent upon SDCL 22-34-1 which is without any tort basis. We are unable to find that the appellant has violated SDCL 22-34-1 as he has not been prosecuted under that statute. Therefore, SDCL 22-34-2 is inapplicable to the case at bar.

*K & E*, 330 N.W.2d at 532 (emphasis in original). The Eighth Circuit has agreed with that interpretation of SDCL 22-34-2. *Rohweder v. Aberdeen Prod. Credit Ass'n*, 765 F.2d 109, 113 (8th Cir. 1985) (citing *K & E*, 330 N.W.2d at 532) ("The district court refused to permit treble damages under SDCL 22-34-2 because it concluded that criminal prosecution under SDCL 22-34-1 was a prerequisite to treble damage liability. We agree.").

---

[26] SDCL 22-34-2 was repealed in 2005. 2005 S.D. Sess. Laws ch. 120 § 99.

To support a recovery in this case under SDCL 40-38-5, Christensen argues that the repeal of SDCL 22-34-2 indicates the Legislature intended there to be a difference between that statutory scheme and the AEPA, Docket 367 at 69 n.59; that public policy supports availability of tort damages without a criminal conviction, particularly in a case where the prosecutorial authorities are alleged to have participated in the tort or where a criminal conviction is difficult to obtain, *id.* at 70-71; and points to decisions by the Colorado Supreme Court and South Dakota Supreme Court for support, *id.* at 69-70.

In the case cited by Christensen, the Colorado Supreme Court held that a statute[27] allowing the owner of property taken by theft, robbery, or burglary to recover treble damages did not require a prior conviction. *Itin v. Ungar*, 17 P.3d 129, 132-35 (Colo. 2000). In reaching this conclusion, the Colorado Supreme Court emphasized that the omission of the word convict, conviction, or convicted "reflects a legislative intent not to require a criminal conviction." *Id.* at 132. Christensen asks this court to follow the reasoning of the Colorado Supreme Court in *Itin* rather than the South Dakota Supreme Court in *K & E.*

First, both SDCL 22-34-2 and SDCL 40-38-5 contain a variation of the term "violation." *Compare* SDCL 22-34-2 ("Any person who violates § 22-34-1 . . . .") *with*

---

[27] Colo. Rev. Stat. Ann. § 18-4-405 (2014) reads in pertinent part that with respect to "[a]ll property obtained by theft, robbery, or burglary . . . [t]he owner may maintain an action . . . against the taker thereof [and recover two hundred dollars or three times the damages sustained, whichever is greater]."

SDCL 40-38-5 ("Any person who has been damaged by reason of a violation of this chapter . . . ."). Because both South Dakota statutes use the term "violation," which is absent from the Colorado statute, *Itin*'s reasoning does not fit this case as closely as the decision in *K & E*. Second, this court is bound to apply South Dakota law. The South Dakota Supreme Court has interpreted a similar statutory scheme— imposing civil liability based on a violation of a criminal statute—to require a criminal conviction before a party may file a civil action for treble damages. An individual prosecuted under the AEPA would enjoy the protections of the criminal process prior to conviction, and the section authorizing civil damages is entirely dependent upon a violation of the preceding sections of the AEPA. The court sees no meaningful difference between the texts of SDCL 22-34-2 and SDCL 40-38-5 that would justify ignoring the interpretation employed by the South Dakota Supreme Court.

Christensen cites a decision in which the South Dakota Supreme Court found that a statute requiring a "violation" of a domestic abuse law as a prerequisite to a restraining order did not require a "conviction" under the domestic abuse statute. *See Trumm v. Cleaver*, 841 N.W.2d 22, 24-25 (S.D. 2013). *Trumm* is distinguishable for two reasons. First, the South Dakota Supreme Court found it significant that the other sections of SDCL 25-10 used the term "conviction" while the relevant section used the term "violation." Based on that difference in terminology, *Trumm* held that the

legislature's choice of the term "violation" must have a different meaning than the term "conviction." *Id.* at 25. SDCL 40-38-5 contains no such juxtaposition of terms. Second, the *Trumm* court reasoned that because victims of domestic abuse are sometimes reluctant, unable, or unwilling to resort to criminal charges, tort claims, or divorce, the underlying policy of the protection order statute was to "provide victims with an efficient, alternative remedy to criminal prosecutions." *Id.* Those policy considerations unique to domestic abuse victims do not apply in the context of the AEPA. Ultimately, *K & E* is more similar to the facts of this case and the statute at hand, and provides better guidance to this court on how the South Dakota Supreme Court might rule.

Christensen's argument that the repeal of SDCL 22-34-2 indicates a legislative intent to eliminate the requirement of a criminal conviction in SDCL 40-38-5 is unsound. SDCL 40-38-5 was enacted in 1992, well after the South Dakota Supreme Court's decision in *K & E*. *See* 1992 S.D. Sess. Laws ch. 291 § 5. When the South Dakota legislature repealed SDCL 22-34-2, it left SDCL 40-38-5 in place. Presumably, the legislature was aware of the South Dakota Supreme Court's precedent requiring a criminal conviction as a prerequisite to the recovery of treble damages under a similar statute. *See, e.g.*, *Couch v. Wilkinson*, 939 F.2d 673, 675 (8th Cir. 1991) ("State legislatures are presumed to know the state of pre-existing law when they enact later law."); *Nelson v. Sch. Bd. of Hill City*, 459 N.W.2d 451, 455 (S.D. 1990) ("It must be

presumed that the legislature was aware of the election requirements of SDCL 13-6-9 (rev. 1982) when it enacted SDCL 13-6-91 in 1983."). Those facts suggest that the legislature chose to enact SDCL 40-38-5 against the backdrop of the *K & E* decision and later chose to leave that statute unchanged while repealing another.

Finally, Christensen provides no support for his speculative public policy argument. See Docket 367 at 70 ("It would be almost inconceivable that Christensen could expect to get the State or the County to find some way to appoint someone who doesn't have a conflict to prosecute the numerous State and County Defendants involved in this action."). Allowing Christensen to avoid the requirement of a criminal conviction by naming enough government officials as defendants or by arguing that obtaining a criminal conviction would be difficult would effectively abrogate the policy decisions of the South Dakota legislature and the South Dakota Supreme Court.

Although the South Dakota Supreme Court has not interpreted SDCL 40-38-5, if faced with the question presented in this case, it would most likely follow *K & E* and require a criminal conviction as a prerequisite to a civil action under SDCL 40-38-5. Because it is undisputed that no defendant in this case has ever been charged with or convicted of a violation of the AEPA stemming from this matter, Christensen cannot prevail on Count V, and summary judgment is granted to all defendants on this count.

### D.    Count VI: Trespass

In Count VI, Christensen alleges that all defendants are liable for the tort of trespass.[28] Under South Dakota law, a trespass occurs when a person "intentionally and without a consensual or other privilege . . . enters land in possession of another . . . ." *Benson v. State*, 710 N.W.2d 131, 159 (S.D. 2006). South Dakota follows the Restatement (Second) of Torts. *See id.*; *State v. Rumpca*, 652 N.W.2d 795, 798 n.2 (S.D. 2002), *superseded by statute on other grounds*, SDCL 41-9-1(2), *as recognized by Alvine Family Ltd. P'ship v. Hagemann*, 780 N.W.2d 507, 513 n.4 (S.D. 2010). Christensen has a property interest in his farm and its buildings. The Restatement recognizes a "privilege to enter land in the possession of another for the purpose of executing [civil] process against the person . . . ." Restatement (Second) of Torts § 208 (1965). The entry is not privileged if it is made under a pretense and is actually for another purpose that would not enjoy a privilege. *Id.* cmt. f. Similarly, an officer may trespass while executing a search warrant. *See Swedlund v. Foster*, 657 N.W.2d 39, 56 (S.D. 2003).

---

[28] Christensen's complaint is captioned as "Negligence per se - Criminal Trespass in violation of SDCL 22-35-6." Docket 133 at 28. But in his briefs opposing the motions for summary judgment, Christensen labels Count VI as "Civil Trespass," cites to case law regarding a civil trespass, and fails to make any mention of a criminal statute or any other source of authority permitting a private cause of action based on a criminal statute. Docket 367 at 72. Therefore, the court will consider Count VI under the tort theory.

### 1.     April 9, 2009

Cunningham and Severson entered Christensen's property to serve the three-day notice. Ostrem entered Christensen's property to execute an arrest warrant. With the exception of Quinn, no other defendant was present that day. As the court found above with respect to all defendants except Quinn, there is insufficient evidence of an agreement or understanding to support Christensen's conspiracy claim. Therefore, all defendants except Quinn[29] present on April 9, 2009, enjoyed a privilege to enter Christensen's property, and they are entitled to summary judgment on Count VI.

Quinn claims to enjoy the privilege available to the other defendants. There is a question of fact, however, as to whether her presence during the service of the arrest warrant and three-day notice for the alleged purpose of protecting the others from loose dogs was a pretense. Christensen points to evidence that Quinn was really on Christensen's property for an impermissible purpose of illegally gathering evidence. Christensen has also identified evidence that after he had been arrested, Quinn entered at least one building. At this point in time, the reason for the privilege no longer existed. Therefore, a jury could find Quinn liable for a trespass on April 9, 2009.

---

[29] Christensen alleges that Landeen-Hoeke conspired to commit the tort of trespass, but only makes this allegation with respect to the seizure of dogs on September 2, 2009. *See* Docket 484 at 86 (limiting Landeen-Hoeke's involvement in the trespass claim to September 2, 2009). Because Landeen-Hoeke was not present on Christensen's property at any time and Christensen only alleges she conspired to trespass on September 2, 2009, the court does not consider Landeen-Hoeke here.

Quinn also contends that Christensen must show actual damage to his property. *See* Docket 474 at 53. This applies when an actor exceeds or unreasonably exercises a privilege, not when an actor trespasses without a privilege. *See* Restatement (Second) of Torts § 214. Accordingly, Quinn is not entitled to summary judgment on Christensen's claim for trespass in Count VI.

Quinn and SCRC filed a joint motion for summary judgment and a joint brief in support of that motion. The brief only discusses Quinn's potential liability for trespass. *See* Docket 474 at 50-53. Because SCRC does not provide any legal authority or argument as to why it should avoid liability other than its contention that Quinn is not liable, and because SCRC could be liable on a respondeat superior theory, SCRC is not entitled to summary judgment on Count VI.

### 2.    September 2, 2009

As discussed in Count I, no defendant other than Quinn and Landeen-Hoeke would have had reason to doubt the validity of the warrant. Service of a facially valid warrant confers upon an actor the privilege to enter the property in question. *See Swedlund*, 657 N.W.2d at 56. Therefore, the court will limit its consideration of this claim to Quinn and Landeen-Hoeke.

There is a question of fact as to whether Quinn intentionally misled the issuing judge when requesting the warrant. If Quinn knew the warrant was invalid, she would

not have been privileged to enter Christensen's property. Therefore, a jury could find that Quinn trespassed on Christensen's property on September 2, 2009.

Christensen also contends that Landeen-Hoeke conspired with Quinn to enter his property and remove his dogs on September 2, 2009. *See* Docket 484 at 86. Although Christensen does not cite any authority, civil conspiracy "is a well-recognized theory of recovery once an underlying tort is established." *Reuben C. Setliff III, M.D., P.C., v. Stewart*, 694 N.W.2d 859, 867 (S.D. 2005). To show a civil conspiracy, Christensen must prove "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." *Setliff,* 694 N.W.2d at 866-67.

There is evidence that Landeen-Hoeke worked with Quinn to obtain the search warrants which resulted in the search and seizure on September 2, 2009. There is also evidence from which a jury could find that Quinn and Landeen-Hoeke agreed on the course of action taken, and that Quinn committed an unlawful act in furtherance of the agreement. Although the parties do not address the issue of damages, there is evidence that some of Christensen's dogs died as a proximate result of the conspiracy and that many other dogs were not returned to Christensen. Therefore, genuine issues of material fact remain with respect to Landeen-Hoeke's involvement in a civil conspiracy to commit a trespass.

### 3.   Immunity

Landeen-Hoeke claims she is immune from Christensen's state-law claims.
Docket 414 at 16-17 (citing *Reasonover*, 447 F.3d at 585). *Reasonover's* holding regarding
immunity for state-law claims was based on Missouri immunity law. *See Reasonover*, 447
F.3d at 585. The court applies state immunity law in determining the scope of
immunity on state-law claims. *See id.*; *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038 (8th
Cir. 2006) (applying Minnesota immunity law to Minnesota state-law claims).

South Dakota provides immunity to public entity employees in certain
circumstances. SDCL 21-32A-2; *Unruh v. Davison Cnty.*, 744 N.W.2d 839, 843 (S.D.
2008). This immunity is an affirmative defense. *Id.* All affirmative defenses must be
raised in the responsive pleading. Fed. R. Civ. P. 8(c); *Jurgensen v. Smith*, 611 N.W.2d
439, 442 (S.D. 2000) ("[A] defendant is required to plead any and all affirmative
defenses in the answer to the plaintiff's complaint.").

Landeen-Hoeke alleges in her amended answer that she was acting in the scope
of her official duties and is therefore entitled to qualified immunity. Docket 145 at 4.
She also alleges in her amended answer that Christensen's claims are barred by the
doctrines of sovereign immunity and absolute immunity. *Id.* at 4-5. Although
Landeen-Hoeke raises numerous immunity defenses, state-law immunity is not one of

them. Accordingly, Landeen-Hoeke, in her individual capacity, is not entitled to state-law immunity under SDCL 21-32A-2.[30]

### E.   Count VII: Conversion

In Count VII, Christensen alleges that all defendants are liable for conversion.[31] " 'Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right.' " *First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton*, 756 N.W.2d 19, 31 (S.D. 2008) (quoting *Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 766 (S.D. 2002)). The intent of the defendant is not a factor. See *W. Consolidated Co-op. v. Pew*, 795 N.W.2d 390, 397 (S.D. 2011). Although South Dakota specifies a damages calculation for conversion by statute, SDCL 21-3-3, South Dakota largely follows the Restatement in defining the scope of the tort itself. *See Rensch v.*

---

[30] Quinn has pleaded the affirmative defense of immunity under SDCL 21-32A in her answer. *See* Docket 141 at 22. Despite asserting that defense in her answer, however, Quinn never raises it in her briefs. As a result, the court does not address that unraised issue.

[31] As with Count VI, the amended complaint frames Count VII as "Negligence per se - Intentional Damage to Private Property in violation of SDCL 22-344 [sic, likely 22-34-1], SDCL 40-1-21 and SDCL 40-2-6." In his brief, Christensen fails to reference any of the statutes included in the caption of the amended complaint, and provides no source of authority for a private right of action under any of those statutes. *See* Docket 367 at 73. Instead, Christensen relies on the tort theory of conversion, which the court will consider to be the intended theory of recovery under Count VII.

94

*Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 270-72 (S.D. 1986) (citing the Restatement (Second) of Torts § 222A (1965)).

All parties other than Quinn reasonably believed they were acting pursuant to a valid warrant for the entire—and brief—time they exercised any dominion or control over the dogs. Any dominion they had was authorized by a facially valid warrant. Only Quinn can be said to have exercised unauthorized control over the dogs. Whether interference with a property right is unauthorized is a factual issue. *See W. Consolidated Co-op.*, 795 N.W.2d at 396. Therefore, Quinn is not entitled to summary judgment on the conversion claim in Count VII. As in Count VI, SCRC provides no argument for summary judgment except that Quinn cannot be liable for conversion. *See* Docket 474 at 54-55. SCRC can be liable for torts of its employees based on a respondeat superior theory. Thus, SCRC is not entitled to summary judgment on Count VII.

Christensen also claims that all defendants conspired to commit the tort of conversion. As the court discussed before, no defendants other than Quinn and Landeen-Hoeke had any knowledge of the omissions Quinn made to the judge issuing the warrant. Therefore, no defendant, except Quinn and Landeen-Hoeke, agreed with another person to commit an unlawful act, namely a conversion. But for the reasons stated above with respect to the agreement to commit a trespass, there are genuine issues of material fact as to whether Quinn and Landeen-Hoeke reached an agreement

95

to convert Christensen's dogs. Therefore, genuine issues of material fact remain with respect to Landeen-Hoeke's involvement in a civil conspiracy to commit conversion.

## III.    PUNITIVE DAMAGES

Christensen claims he is entitled to punitive damages based on Counts III-VII. See Docket 133 (amended complaint). The court has dismissed Counts III, IV, and V. Generally, punitive damages are not recoverable in tort actions unless expressly allowed by statute. *Risse v. Meeks*, 585 N.W.2d 875, 877 (S.D. 1998). South Dakota law allows a jury to award punitive damages where a defendant has acted with "oppression, fraud, or malice, actual or presumed." SDCL 21-3-2; *see also Hoaas v. Griffiths*, 714 N.W.2d 61 (S.D. 2006) (allowing punitive damages in a conversion suit); *Till v. Bennett*, 281 N.W.2d 276 (S.D. 1979) (allowing punitive damages in a case involving trespassing cattle). In this case, there is evidence from which a jury could find that Quinn and Landeen-Hoeke acted with the requisite culpability to impose punitive damages.

## IV.    CHRISTENSEN'S MOTIONS FOR SUMMARY JUDGMENT

Christensen moves for summary judgment against HSUS, Pacelle, Haisley, Dr. Dale, Dr. Bauknecht, UAN, Landeen-Hoeke, Quinn, SCRC, Severson, Cunningham, and Ostrem. The court has held that HSUS, Pacelle, Haisley, Dr. Dale, Dr. Bauknecht, UAN, Severson, Cunningham, and Ostrem are entitled to summary

judgment themselves. Accordingly, Christensen's motions for summary judgment with respect to those defendants are denied.

With respect to Quinn and SCRC, genuine issues of material fact remain as to whether she entered one of Christensen's outbuildings on April 9, 2009; whether she did so in a good faith effort to locate Christensen and protect others from loose dogs; whether she intentionally misled the issuing judge or acted with reckless disregard for the truth in applying for the warrants on September 2, 2009; whether her presence on Christensen's property on September 2, 2009, was a pretense for an unconstitutional seizure; whether she conspired with anyone to violate Christensen's constitutional rights; whether she unlawfully trespassed on April 9, 2009, and September 2, 2009; whether she conspired to unlawfully trespass; whether she exercised unauthorized control over Christensen's dogs; whether her interference with Christensen's property rights was warranted; and whether she conspired with anyone to commit the tort of conversion. Viewing the evidence in the light most favorable to Quinn, a jury could find that she acted in good faith throughout the times in question and did not conspire with anyone to violate Christensen's constitutional rights or commit trespass or conversion. Therefore, Christensen's motion for summary judgment against Quinn and SCRC is denied.

With respect to Landeen-Hoeke, genuine issues of material fact remain as to whether she conspired with Quinn to commit the torts of trespass or conversion.

97

Viewing the evidence in the light most favorable to Landeen-Hoeke, a jury could find that she did not reach an agreement or understanding with Quinn to commit any illegal conduct. Christensen's motion for summary judgment against Landeen-Hoeke is denied.

## CONCLUSION

Christensen sees in this case a sweeping conspiracy between all the named defendants to run him out of business. Christensen, however, has not identified evidence to show that any defendants except Quinn and Landeen-Hoeke were doing anything other than investigating what they reasonably believed to be a puppy mill in Turner County. On Count II, each defendant except Quinn was privileged to enter Christensen's property on April 9, 2009. Genuine questions remain with respect to Quinn's motives and the scope of her activity on that day. On Count I, without evidence that the defendants other than Quinn and Landeen-Hoeke conspired to illegally seize Christensen's animals based on improperly obtained warrants, Christensen cannot establish a violation of § 1983. Genuine questions of fact remain as to whether Quinn conspired to submit affidavits that violated Christensen's Fourth Amendment rights. Landeen-Hoeke enjoys absolute immunity.

On Counts III, IV, and V, Christensen has not identified evidence sufficient to meet his burden on each element of the alleged torts. On Counts VI and VII, Christensen identified sufficient evidence to create a jury question as to whether

Quinn is liable for trespass or conversion, and whether Landeen-Hoeke conspired with Quinn to commit those torts. Accordingly, it is

ORDERED that the motions for summary judgment filed by Lara Cunningham and James Severson (Docket 329), United Animal Nations (Docket 333), Dr. Adam Bauknecht and Dr. Dawn Dale (Docket 340), Wayne Pacelle and the Humane Society of the United States (Docket 345), James Adamson, Luverne Langerock, John Overby, Steve Schmeichel, Lyle Van Hove, Byron Nogelmeier, Jay Ostrem, and Turner County (Docket 386), and Scottlund Haisley (Docket 431) are granted.

IT IS FURTHER ORDERED that the motion for summary judgment filed by Rosie Quinn and Second Chance Rescue Center (Docket 472) is granted on Counts III, IV, and V and denied on Counts I, II, VI, and VII.

IT IS FURTHER ORDERED that the motion for summary judgment filed by Tiffani Landeen-Hoeke (Docket 413) is granted on Counts I, II, III, IV, and V and denied on Counts VI and VII.

IT IS FURTHER ORDERED that the motions for summary judgment filed by Dan Christensen against the Humane Society of the United States, Wayne Pacelle, and Scottlund Haisley (Docket 459), Dr. Dawn Dale and Adam Bauknecht (Docket 465), United Animal Nations (Docket 469), Tiffani Landeen-Hoeke (Docket 493),

Rosie Quinn and Second Chance Rescue Center, and James Severson, Lara Cunningham, and Jay Ostrem (Docket 549) are denied.

IT IS FURTHER ORDERED that the court will schedule a jury trial on the remaining claims against Quinn (Counts I, II, VI, and VII) and Landeen-Hoeke (Counts VI and VII).

Dated September 10, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

100